547 A.2d 1229

**Wayne K. BOYD, in his own right and as Administrator of the Estate of Chardella Boyd, Deceased, and as Parent and Guardian on Behalf of Darren Boyd, and Patrice Boyd, Minor Children of the Deceased, Appellant,**

v.

**ALBERT EINSTEIN MEDICAL CENTER, Northern Division, the Health Maintenance Organization of Pennsylvania, David E. Rosenthal, M.D., Perry L. Dornstein, M.D., Erwin Cohen, M.D., Appellees.**

Superior Court of Pennsylvania.

Argued June 8, 1988.

Filed Sept. 22, 1988.

Kenneth W. Richmond, Philadelphia, for appellant.

Nancy L. Siegel, Philadelphia, for Health Maintenance, appellee.

Before McEWEN, OLSZEWSKI and CERCONE, JJ.

OLSZEWSKI, Judge:

This is an appeal from the trial court's order granting summary judgment in favor of defendant/appellee, Health Maintenance Organization of Pennsylvania (hereinafter HMO). Appellant asserts that the trial court erred in granting the motion for summary judgment when there

existed a question of material fact as to whether participating physicians are the ostensible agents of HMO. For the reasons stated below, we reverse the grant of summary judgment.

The facts, as averred by the parties in their pleadings and elicited through deposition testimony, reveal that at the time of her death, decedent and her husband were participants in the HMO. HMO is a medical insurance provider that offers an alternative to the traditional Blue Cross/Blue Shield insurance plan.[1] Decedent's husband became eligible for participation in a group plan provided by HMO through his employer. Upon electing to participate in this plan, decedent and her husband were provided with a directory and benefits brochure which listed the participating physicians. Restricted to selecting a physician from this list, decedent chose Doctor David Rosenthal and Doctor Perry Dornstein as her primary care physicians.

In June of 1982, decedent contacted Doctor David Rosenthal regarding a lump in her breast. Doctor Rosenthal ordered a mammogram to be performed which revealed a suspicious area in the breast. Doctor Rosenthal recommended that decedent undergo a biopsy and referred decedent to Doctor Erwin Cohen for that purpose. Doctor Cohen, a surgeon, is also a participating HMO physician. The referral to a specialist in this case was made in accordance with the terms and conditions of HMO's subscription agreement.[2]

1. "A Health Maintenance Organization is an organized system of health care which provides or arranges for a comprehensive array of basic and supplemental health care services. These services are provided on a prepaid basis to voluntarily enrolled members living within a prescribed geographic area. Responsibility for the delivery, quality and payment of health care falls to the managing organization—the HMO." Physicians Office Coordinator Training Manual citing *HMOs An Alternative to Today's Health Care System.* A Towers, Perrin, Forster, and Crosby Background Study, December 1975.

2. Doctor Rosenthal admitted in his deposition that HMO limited specifically the doctors to whom decedent could have been referred. Deposition, p. 70.

On July 6, 1982, Doctor Cohen performed a biopsy of decedent's breast tissue at Albert Einstein Medical Center. During the procedure, Doctor Cohen perforated decedent's chest wall with the biopsy needle, causing decedent to sustain a left hemothorax. Decedent was hospitalized for treatment of the hemothorax at Albert Einstein Hospital for two days.

In the weeks following this incident decedent complained to her primary care physicians, Doctor David Rosenthal and Doctor Perry Dornstein, of pain in her chest wall, belching, hiccoughs, and fatigue. On August 19, 1982, decedent awoke with pain in the middle of her chest. Decedent's husband contacted her primary care physicians, Doctors Rosenthal and Dornstein, and was advised to take decedent to Albert Einstein hospital where she would be examined by Doctor Rosenthal. Upon arrival at Albert Einstein emergency room, decedent related symptoms of chest wall pain, vomiting, stomach and back discomfort to Doctor Rosenthal. Doctor Rosenthal commenced an examination of decedent, diagnosed Tietz's syndrome,[3] and arranged for tests to be performed at his office where decedent underwent x-rays, EKG, and cardiac ioenzyme tests.[4] Decedent was then sent home and told to rest.[5]

During the course of that afternoon, decedent continued to experience chest pain, vomiting and belching. Decedent

**3.** Tietze's Syndrome is an inflammatory condition affecting the costochondral cartilage. It occurs more commonly in females, generally in the 30 to 50 age range. Deposition of Doctor Rosenthal, p. 48.

**4.** HMO avers that decedent was returned to the doctor's office for testing because it was more comfortable and convenient for her. Appellant, however, asserts that the tests were performed in the doctor's office, rather than the hospital, in accordance with the requirements of HMO whose primary interest was in keeping the medical fees within the corporation.

**5.** Appellant contends that Doctor Rosenthal acted negligently in ordering the tests to be performed in his office when decedent exhibited symptoms of cardiac distress. The safer practice, avers appellant, would have been to perform the tests at the hospital where the results would have been more quickly available. Appellant further contends that, despite Doctor Rosenthal's diagnosis of Tietze's Syndrome, the nature of the tests he ordered indicates that he was concerned about the possibility of a heart attack.

related the persistence and worsening of these symptoms by telephone to Doctors Rosenthal and Dornstein, who prescribed, without further examination, Talwin, a pain medication. At 5:30 that afternoon decedent was discovered dead in her bathroom by her husband, having expired as a result of a myocardial infarction.

Appellant's complaint and new matter aver that HMO advertised that its physicians and medical care providers were competent, and that they had been evaluated for periods of up to six months prior to being selected to participate in the HMO program as a medical provider. The complaint further avers that decedent and appellant relied on these representations in choosing their primary care physicians. The complaint then avers that HMO was negligent in failing to "qualify or oversee its physicians and hospital who acted as its agents, servants, or employees in providing medical care to the decedent nor did HMO of Pa. require its physicians, surgeons and hospitals to provide adequate evidence of skill, training and competence in medicine and it thereby failed to furnish the decedent with competent, qualified medical care as warranted." Paragraph 39, plaintiff's amended complaint. Finally, appellant's new matter avers that HMO furnished to its subscribers documents which identify HMO as the care provider and state that HMO guarantees the quality of care. Plaintiff's new matter, paragraph 18.

Appellant's theory of recovery before the trial court was primarily one of vicarious liability under the ostensible agency theory. *See Capan v. Divine Providence Hospital,* 287 Pa.Super. 364, 430 A.2d 647 (1980). In granting defendant HMO's motion for summary judgment, the trial court found that plaintiff/appellant had failed to establish either of the two factors on which the theory of ostensible agency, as applied to hospitals in *Capan,* is based. On appeal, appellant contends that the evidence indicates that there exists a question of fact regarding whether HMO may be held liable under this theory.

Before embarking on a substantive analysis of appellant's claims, we must delineate our well-settled standard of review in cases involving the granting of summary judgment. Initially we note that our standard of review in such cases is plenary. *Thornburgh v. Lewis*, 504 Pa. 206, 209, 470 A.2d 952, 954 (1983). Summary judgment may be granted: " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' Pa.R.C.P. 1035. In considering a motion for summary judgment, the trial court is bound to follow several firmly established principles. Specifically, the court must examine the entire record in the light most favorable to the non-moving party. The court's sole function is to determine whether there is an issue of fact to be tried and not to decide issues of fact. Finally, the court must resolve all doubts as to the existence of a genuine issue of fact against the party moving for summary judgment." *See Taylor v. Tukanowicz*, 290 Pa.Super. 581, 586, 435 A.2d 181, 183 (1981); *Schacter v. Albert*, 212 Pa.Super. 58, 62, 239 A.2d 841, 843 (1968).

*Perry v. Middle Atlantic Lumbermans Association*, 373 Pa.Super. 554, 542 A.2d 81 (1988). Summary judgment should not be entered unless the case is free from doubt. *Weiss v. Keystone Mack Sales, Inc.*, 310 Pa.Super. 425, 456 A.2d 1009 (1983). Further, the moving party has the burden of proving that no genuine issue exists as to a material fact. For that reason the record is examined in a light most favorable to the non-moving party, and in doing so our Court shall accept as true all well-pleaded facts in the non-moving party's pleadings. *Hower v. Witmak Associates*, 371 Pa.Super. 443, 538 A.2d 524 (1988).

Preliminarily, we note that Pennsylvania courts first recognized the theory of ostensible agency in *Capan v. Divine Providence Hospital*, 287 Pa.Super. 364, 430 A.2d 647 (1980).

There, pursuant to instructions by our Supreme Court, we determined that the trial court had erred in failing to instruct the jury on the Restatement (Second) of Torts § 429 (1965). We further pointed out that Section 429 provided an exception to the general rule that an employer is not liable for torts committed by an independent contractor in his employ. *Capan*, [*supra*, ] at 367, 430 A.2d at 648. Section 429 states:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

In adopting the theory of ostensible agency, we noted that several jurisdictions had applied the concept to cases involving hospital liability for the negligence of independent contractor physicians. [*Id.*] at 368, 430 A.2d at 649. We also noted two factors which contributed to the conclusion by other courts that, although a physician holds independent contractor status with respect to the hospital, he may nevertheless be an agent of the hospital with respect to the patient. First, there is a likelihood that patients will look to the institution rather than the individual physician for care due to the changing role of the hospital in today's society. Second, "where the hospital 'holds out' the physician as its employee[,]" a justifiable finding is that there is an ostensible agency relationship between the hospital and the physician. *Id. See also, Simmons v. St. Clair Hospital*, 332 Pa.Super. 444, 481 A.2d 870 (1984). We recognized that a holding out occurs "when the hospital acts or omits to act in some way which leads the patient to a *reasonable* belief he is being treated by the hospital or one of its employees." *Capan*, [*supra*,] at 370, 430 A.2d at 649. (Citation omitted) (Emphasis in original).

*Thompson v. Nason Hospital,* 370 Pa.Super. 115, 535 A.2d 1177 (1988).

We must, therefore, consider appellant's claim in light of Section 429 and decide whether there is an issue of material fact as to participating physicians being the ostensible agents of HMO. In order to make these determinations, we will discuss, initially, the arrangement between HMO and participating doctors and their relationship with HMO members.

The record reflects that, through his employer, appellant became eligible for and ultimately chose to participate in a group plan provided by the Health Maintenance Organization of Pennsylvania (hereinafter HMO).[6] As part of its services, HMO provided its members with a brochure explaining, in general outline form only, the main features of the program of benefits. Appellant's brief, appendix E. The brochure also provided a directory of participating primary physicians and declared that the complete terms and conditions of the plan were set forth in the group master contract. *Id.*

The group master contract provides that HMO "operates a comprehensive prepaid program of health care which provides health care services and benefits to Members in order to protect and promote their health, and preserve and enhance patient dignity." Group master contract, Form HMOPA/GM–6 (5/83) of record [hereinafter group master contract].[7] HMO was incorporated in 1975 under the laws

---

**6.** In a document entitled "Why offer HMO–PA?", Appellee's brief at 55b, HMO reasoned to employers that HMO "is a total care program which not only insures its subscribers, but provides medical care, guarantees the quality of the care and controls the costs of health care services." The document also claimed that "HMO–PA is more than just another health insurance plan. HMO–PA is an entire health care system. HMO–PA provides the physicians, hospitals and other health professionals needed to maintain good health. HMO–PA assures complete security, when illness or injury arises." Appellee's brief at 58b. Finally, the document provided that HMO–PA "[a]ssumes responsibility for quality and accessibility." Appellee's brief at 61b.

**7.** The introduction to the group master contract also provides that "HMOPA operates on a direct service rather than indemnity basis.

of Pennsylvania and converted from a non-profit to a for-profit corporation in 1981. Training manual of record at 1. HMO is based on the individual practice association model (hereinafter IPA), which means that HMO is comprised of participating primary physicians who are engaged in part in private practice in the HMO service area. *Id.* Under the plan, IPA contracts with HMO to provide medical services to HMO members. *Id.* at 1–2. IPA selects its primary and specialist physicians and enters into an agreement with them obligating the physician to perform health services for the subscribers of HMO. Primary physician agreement of record at 1.

"A physician applying for membership in the IPA of the HMO–PA should expect a four to six months review process prior to admission to the organization." Document entitled Membership Process of the IPA of record at 1. When an interested physician calls the IPA, the Provider relations representative reviews the physician's credentials and the reasons for his interest in HMO. The physician then subsequently receives an application packet that requests the applicant's *curriculum vitae,* four letters of recommendation, copies of the state license, and evidence of malpractice insurance. Soon thereafter, the IPA coordinator visits the applicant's practice in order to: (1) observe how the office is run, how the office personnel treat patients, and the ability of the office to absorb a number of new patients; (2) inspect the actual physical plant to ensure that appropriate procedures, space, and necessary medical equipment are available; (3) explain the payment system, the incentive program, and the rights and responsibilities of an IPA physician; and (4) set up a medical director's interview. *Id.* at 1–2.

After interviewing the applicant,[8] the medical director makes a recommendation that is forwarded to the member-

The interpretation of the Contract shall be guided by the direct service nature of HMOPA's prepaid program." Group master contract at 1.

8. During the interview, the medical director reviews applicant's understanding of the HMO and IPA, the physician's referral pattern, how he would handle various medical problems, and his medical charts.

ship committee, which thoroughly discusses and determines whether the applicant has met all the criteria for membership. The criteria include: Twenty-four-hour-a-day coverage provided with another IPA member for office and hospital patients, with any exclusions being approved by the executive committee; prior routine hospitalization of patients on his own service at a participating HMO hospital; specific routinely performed procedures including minor surgery and office gynecology; scheduling of appointments at a rate of no more than five patients per hour per doctor; and office records that are legible, reproducible, and pertinent. *Id.* at 3–4.

The membership committee makes a recommendation to the executive committee, which makes the final decision regarding the applicant. Those accepted into the IPA are called by an IPA coordinator, who schedules an office orientation.

The primary physician's role is defined as the "gatekeeper into the health care delivery system." Document entitled Role of the Primary Physician of record at 1. "An HMO member must consult with his primary physician before going to a specialist and/or the hospital." *Id;* Group master contract at II B. If the primary physician deems it necessary, he arranges a consultation with an HMO participating specialist, which constitutes a second opinion. Role of the Primary Physician at 1. "Basically, with the primary physicians 'screening' the members' illnesses, excessive hospitalization and improper use of specialists can be reduced." *Id.*

Member-patients use a physician directory and choose a conveniently located office of a participating primary physician. HMO members will only receive reimbursement from non-participating providers when the condition requiring treatment was of an immediate nature. Determinations of immediacy are made by the HMO quality assurance committee. In any event, persons desiring emergency non-provider benefits must notify HMO or their primary physician of the emergency within forty-eight hours and must give written

proof of the occurrence within ninety days after service is rendered. Group master contract at 13. Reimbursement for emergency care by a non-participating provider is limited to expenses incurred prior to the time the member's condition, "in the opinion of HMOPA, reasonably permitted him or her to travel or be transported to the nearest HMOPA Participating Provider, or to receive follow-up care from a Participating Provider, upon referral by the Member's Participating Primary Physician." *Id.* at 14.

Primary physicians are paid through a mechanism termed "capitation." Capitation is an actuarially determined amount prepaid by HMO to the primary physician for each patient who has chosen his office. Revised attachment AA to primary physician agreement. The dollar amount is based upon a pre-determined rate per age group. The primary physicians are paid 80% of the capitation amount and the remaining 20% is pooled by IPA and goes back into a pooled risk-sharing fund as a reserve against specialty referral costs and hospital stays. Each primary care office has its own specialist fund and hospital fund established by allocating a pre-determined amount each month for each member who has chosen that primary care office. The surplus from the specialist fund is returned to the primary care office. The hospital fund, however, is governed by a hospital risk/incentive-sharing scheme which anticipates a number of inpatient days per members per year. If the actual hospital utilization is less than anticipated, the HMO and IPA each receive 50% of the savings. IPA must place the savings in the Special IPA risk-sharing account and must use the funds to offset losses resulting from unanticipated physician costs. Attachment B to primary physician agreement. If utilization is greater than anticipated, IPA is responsible for 50% of the loss up to the amount of uncommitted funds in the Special IPA risk sharing account. *Id.*

■ Appellant asserts that he has raised a question of material fact as to whether the treating physicians were the ostensible agents of HMO. As delineated *supra,* Pennsylvania courts have determined that the two factors relevant

to a finding of ostensible agency are: (1) whether the patient looks to the institution, rather than the individual physician for care, and (2) whether the HMO "holds out" the physician as its employee. Also instructive is the definition of apparent or ostensible agency in Restatement (Second) of Agency, Section 267, which provides:

One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Comment (a) to Section 267 is particularly instructive: The mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not sufficient to cause the apparent master to be liable; [rather,] ... [t]he rule normally applies where the plaintiff has submitted himself to the care or protection of an apparent servant in response to an invitation from the defendant to enter into such relations with such servant.

■■ HMO asserts that because the theory of ostensible agency has been applied in Pennsylvania only to the relationship between hospitals and independent contractor physicians, the theory is not appropriate in the instant situation. We emphasize, however, that when this Court introduced the concept of ostensible agency to this Commonwealth in *Capan, supra*, we based that decision in large part upon "the changing role of the hospital in society [which] creates a likelihood that patients will look to the institution" for care. *Id.* 287 Pa.Super. at 368, 430 A.2d at 649. Because the role of health care providers has changed in recent years, the *Capan* rationale for applying the theory of ostensible agency to hospitals is certainly applicable in the instant situation.

Therefore, while *Capan* is distinguishable on its facts, it is instructive in our resolution of the instant matter. Moreover, we are guided not so much by facts of *Capan* and its progeny as their delineation of the theory of ostensible

agency as contained in Restatement (Second) of Torts and their justification for implementing the theory.

We find that the facts indicate an issue of material fact as to whether the participating physicians were the ostensible agents of HMO. HMO covenanted that it would "[provide] health care services and benefits to Members in order to protect and promote their health...." Group master contract at 1. "HMOPA operates on a direct service rather than an indemnity basis." *Id.* Appellant paid his doctor's fee to HMO, not to the physician of his choice. Then, appellant selected his primary care physicians from the list provided by HMO. Regardless of who recommended appellant's decedent to choose her primary care physician, the fact remains that HMO provides a limited list from which a member must choose a primary physician. Moreover, those primary physicians are screened by HMO and must comply with a list of regulations in order to honor their contract with HMO. *See* discussion and footnote 8, *supra.*

Further, as mandated by HMO, appellant's decedent could not see a specialist without the primary physician's referral. As HMO declares, the primary physician is the "gatekeeper into the health care delivery system." Document entitled Role of the Primary Physician of record at 1. "An HMO member must consult with his primary physician before going to a specialist and/or the hospital." *Id.* Moreover, appellant's decedent had no choice as to which specialist to see. In our opinion, because appellant's decedent was required to follow the mandates of HMO and did not directly seek the attention of the specialist, there is an inference that appellant looked to the institution for care and not solely to the physicians; conversely, that appellant's decedent submitted herself to the care of the participating physicians in response to an invitation from HMO. *See* comment (a), Restatement (Second) Agency § 267.

Summary judgment should be granted only where there is not the slightest doubt as to the absence of a triable issue of fact. *Thompson, supra,* 370 Pa.Super. at 120, 535 A.2d at 1180, citing *Chandler v. Johns–Manville Corp.,* 352

Pa.Super. 326, 507 A.2d 1253 (1986); *Long John Silver's, Inc. v. Fiore*, 255 Pa.Super. 183, 386 A.2d 569 (1978). Based on the foregoing, we find that there is an issue of material fact as to whether the participating physicians were the ostensible agents of HMO. We conclude, therefore, that the trial court erred when it granted HMO's motion for summary judgment on the ground that the participating physicians were not the ostensible agents of HMO.

The order granting summary judgment is reversed and the case remanded for proceedings consistent with this opinion. Jurisdiction is relinquished.

McEWEN, J., concurs with opinion.

McEWEN, Judge, concurring:

I concur in the result reached by the majority since the author, after a very careful analysis of the issues presented in this appeal, reaches the quite basic principle that issues of material fact may not be resolved by summary judgment.

I write only because it appears to me that the learned trial court improperly resolved by summary judgment the basic factual issue of whether the literature, in which HMO "guaranteed" and "assured" the quality of care provided to its subscribers, had been distributed to appellant or to other subscribers of HMO.

It might also be mentioned that while the court was understandably uncertain as to the theories upon which plaintiff was proceeding[1], it appears that the amended complaint of plaintiff does contain factual averments supporting a breach of warranty claim. *See: Alpha Tau Omega Fraternity v. University of Pennsylvania*, 318 Pa.Super. 293, 298, 464 A.2d 1349, 1352 (1983) ("Pennsylva-

---

1. The trial court noted in its opinion that "the gravamen of plaintiff's complaint is that HMO of PA guaranteed or warranted the quality of care provided.... Plaintiff's theory of recovery ... is not entirely clear. A reading of the complaint suggests Plaintiff is proceeding upon grounds of corporate liability. However, in his answer to the motion of HMO of PA for summary judgment, plaintiff contends HMO of PA is vicariously liable through ostensible agency."

nia is a fact-pleading state."). *Accord: Smith v. Brown,* 283 Pa.Super. 116, 119, 423 A.2d 743, 745 (1980).