256 N.J. Super. 180 (1992)
606 A.2d 862
LINDA B. DUNN, INDIVIDUALLY, AND THE ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF CAREY DUNN, PLAINTIFF-APPELLANT, CROSS-RESPONDENT,
v.
DONALD E. PRAISS, M.D., JOEL E. MARMAR, M.D., SOUTH JERSEY UROLOGIC ASSOCIATES, MARTHA BRUMBAUGH, M.D., HEALTH CARE PLAN OF NEW JERSEY, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 1, 1992.
Decided May 4, 1992.
*184 Before Judges DREIER, GRUCCIO and BROCHIN.
Joseph Di Rienzo argued the cause for appellant (Di Rienzo, Wallerstein & Fellman, attorneys; Joseph Di Rienzo, Andrew Siegeltuch and Susan B. Fellman, on the brief).
Mary Louise Ambrose argued the cause for respondent Dr. Praiss (Dughi & Hewit, attorneys; Thomas B. Leyhane and Charles B. Austermuhl, on the brief).
Stephen M. Greenberg argued the cause for respondents Dr. Marmar and South Jersey Urologic Associates (Stern & Greenberg attorneys; Herbert J. Stern, on the brief).
Eli L. Eytan argued the cause for respondents Dr. Brumbaugh and Health Care Plan of New Jersey (Grossman & Kruttschnitt, attorneys; Eli L. Eytan, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
*185 Plaintiff has appealed from certain trial rulings, and defendants have cross-appealed from the judgment entered in this medical malpractice action. Notwithstanding plaintiff having filed the initial appeal, and since it is our ruling on the cross-appeal that will govern the issues that need to be decided in plaintiff's appeal, we will first consider defendant's cross-appeal attacking the judgment.
Plaintiff, Linda B. Dunn, individually and as the administratrix ad prosequendum of the estate of her late husband, Carey Dunn, commenced this medical malpractice action against Donald E. Praiss, M.D. and Joel E. Marmar, M.D., both urologists practicing as part of defendant South Jersey Urologic Associates. Plaintiff alleged that the defendant physicians were negligent in failing to diagnose testicular cancer in her husband at a time when there was a substantial probability that he would have survived after treatment. Additionally, she sued Martha Brumbaugh, M.D., a primary care physician employed by defendant Health Care Plan of New Jersey, a health maintenance organization (HMO) which retained South Jersey Urologic Associates to provide urological services to its plan members. South Jersey Urologic Associates is not paid on a fee for service basis. Rather, it receives a per capita fee based upon the total number of subscribers to the HMO. Although some services were provided in South Jersey Urologic Associates' own offices, urologic services were generally provided to the HMO subscribers at the HMO premises.
Both a former doctor who had treated decedent and another doctor who was one of the South Jersey Urologic Associates partners also had been named as defendants, but they were voluntarily dismissed prior to trial. All claims against Dr. Praiss were dismissed under R. 4:37-2 following the testimony *186 of plaintiff's experts.[1] Defendants also moved during trial to dismiss all claims against Dr. Brumbaugh and the HMO.
Plaintiff had originally claimed that the HMO was liable both on theories of negligence and for a contractual breach, and that Dr. Brumbaugh was liable on a contractual breach theory. Since as hereafter explained, we have determined that the HMO is vicariously responsible for the actions of Dr. Marmar, we need not reach plaintiff's contractual theories against the HMO and Dr. Brumbaugh.
After a three week trial, the jury returned a verdict in favor of plaintiff against Dr. Marmar and South Jersey Urologic Associates in the amount of $2,904,240.54. The trial judge denied their motion for a new trial. We here affirm the liability judgment, but are constrained to set aside portions of the judgment for damages because of trial errors which may have so confused the jury that various elements of damages determined by the jury cannot be reconstructed with any substantial certainty.

I  Factual Background

In May 1982 Carey Dunn worked as a rigger in the Navy Yard in Philadelphia. He had both pain and swelling caused by an inflammation in the epididymis, the tissue surrounding his *187 right testicle. In conjunction with this epididymitis, he developed a hydrocele, a collection of fluid in the scrotal sack causing significant swelling. At that time he was treated by a private physician, and this condition improved with antibiotics. In December 1982 decedent experienced a recurrence of his symptoms. In the interim he had become a member of Health Care Plan of New Jersey, a health maintenance organization, which provided a "primary care physician" (Dr. Brumbaugh) and also specialists in most areas of medicine. On January 3, 1983, Dr. Brumbaugh diagnosed a recurrence of the epididymitis and referred decedent to Dr. Praiss, a board certified urologist and member of South Jersey Urologic Associates which practiced under a contract with the HMO. Dr. Praiss saw the decedent at the Cherry Hill facility of the HMO as part of his weekly assignment as a staff member of the plan. He maintained a private practice as well with his urologic partners. In his examination of Mr. Dunn he diagnosed an atrophic (shrunken) testicle with persistent hydrocele and a possible left inguinal hernia. He sent decedent to Cooper Medical Center for a scrotal scan which was performed on February 14, 1983. The radiological report noted:
There is apparently a lucent or avascular region on the right side of the scrotum, which might suggest an avascular mass be it a hydrocele or a solid mass. The study could not distinguish between the hydrocele and the solid mass.
While Dr. Praiss did not then order tests to determine the composition of the "mass" or whether it was cancerous, he did schedule a return appointment for decedent for February 22, 1983.
Decedent returned to the HMO office and was seen by Dr. Marmar, another partner of South Jersey Urologic Associates, who also saw patients at the HMO offices on a weekly basis. Dr. Marmar ordered no follow-up tests to determine the content of the mass or whether it was cancerous. He was aware, however, that decedent had had testicular problems since May 1982, but after the initial improvement the present condition had existed for approximately two months. Although there *188 were then-existing blood tests for testicular cancer and the radiological report had shown a questionable mass, he merely told decedent to note any change in his pain or in the size of the mass through self-examination and to return if necessary. During his deposition Dr. Marmar testified that he could not remember what he told decedent, but his examination notes stated: "Patient will observe size of mass and pain. May need hydrocelectomy." A hydrocelectomy is an operation which drains fluid and would permit a determination of whether the mass was a hydrocele or cancer. Dr. Marmar failed to schedule a follow-up visit and made no contact with decedent thereafter. In fact, neither Drs. Praiss nor Marmar saw decedent following February 1983 and, notwithstanding the assertions of the HMO in its promotional literature, the primary care physician also had no further contact with decedent following the urological consultations.
For the next several months although the hydrocele had become firmer, decedent had no localized pain and explained to his wife that Dr. Marmar had told decedent that the swelling was a hydrocele and that "it could stay like that for a year." Decedent's wife understood Dr. Marmar to have told decedent to return only if he had pain.
In October 1983 decedent began experiencing a full feeling in his chest. In November he returned to the HMO and was seen by Dr. Brumbaugh. On November 28, 1983, she examined him and ordered medication and various tests including an ultrasound of decedent's gall bladder and liver. The ultrasound indicated cancer which had spread to the liver. Among various other consultations was a urological reexamination by a third partner of South Jersey Urologic Associates who found that the right testicle was irregular, the same finding that appeared in one of Dr. Praiss' notes of February 1983, a note which Dr. Marmar had seen when he examined decedent on February 22, 1983.
*189 On behalf of the HMO, Dr. Brumbaugh referred decedent to two oncologists, one of whom ordered a beta HCG test, a specific test to diagnose testicular cancer. The testimony showed that a normal HCG is approximately 1.5. The test of decedent's blood yielded a result of 170,000, a virtually certain diagnosis of testicular cancer. One of the oncologists admitted decedent to Cooper Medical Center with a diagnostic impression of germinal cell carcinoma of the right testis, metastatic to the liver. The discharge diagnosis was germinal cell carcinoma of the testis. The oncologist treated decedent with four rounds of chemotherapy during which the HCG level fell first to 18,537, then to 394, then to 94. After the fourth round the right testicle was removed and tissue examined by a pathologist. At that point the remaining tumor, a mature teratoma, was found not to have malignant cells.
Decedent was then referred to a doctor outside of the HMO at Indiana University. There he was treated with experimental chemotherapy by Lawrence Einhorn, M.D., a world-famous specialist in testicular cancer. Upon decedent's return, he continued treatment with the local oncologist in conjunction with Dr. Einhorn.
As Dr. Einhorn explained in December of 1983, when the testicular cancer diagnosis was finally made, the cancer had metastasized to the liver producing nausea and pain. Almost all of the cancer was killed with chemotherapy, but it was so advanced at the time of the treatment that decedent's life could not be saved. Dr. Einhorn testified that if the diagnosis had been made at any time between February 1983 through September 1983 it was virtually certain that the cancer could have been conquered and decedent's life saved. Decedent died on April 30, 1985 at the age of 38, leaving a widow and two children, ages 17 and 12. All of the treating doctors as well as defendant's expert agreed that decedent died of metastatic testicular cancer. After years of discovery and preparation in the case through the final pretrial conference when defendant suddenly *190 changed attorneys, there had been no suggestion of any different diagnosis.

II  Limitation of Defendant's Causation Proofs

The sole dissenting voice on the issue of causation was defendant's new attorney, substituted approximately one month before the final but often-adjourned trial date. Defendants contend that they were then unduly hampered in the preparation of their case when they were denied permission to present a report of an oncology expert whom they proposed to present at trial. He allegedly would claim that decedent died not of a metastasized testicular cancer, but rather from a cancer which had originated elsewhere in his body.[2] No certification was presented from the proposed witness, but the attorney described what he expected the witness to say. Defendants also sought to obtain tissue blocks taken from the testicle that had been removed (they already had tissue slides) to have them examined by their new expert. The civil presiding judge denied defendant's motion to reopen discovery, to permit defendant to produce an expert oncologist's report, to add an oncologist expert to the proposed witnesses and to obtain the tissue blocks for examination. Defendants renewed their motion before the trial judge and it was again denied, as was their motion for leave to appeal to the Appellate Division. After the trial, defendants' motion for a new trial was based upon the same *191 alternative cause theory, although there had been no substantial evidence[3] supporting this point. The trial judge denied the motion.
Defendants' change in counsel certainly was not a basis to have the trial delayed so that his new legal or medical theories could be explored after four and one-half years of discovery. But if there was a substantial basis in fact for the new attorney's application, the court should not be so controlled by calendar problems that justice might be sacrificed. In a case that probably was going to return a seven figure judgment if the liability were proven, more than a cursory analysis was needed. Here both judges who considered the issue explored the problem in depth. Indeed, both plaintiff's and defendants' witnesses, as well as the independent treating physicians, including the oncologists retained by the HMO, supported plaintiff's theory of testicular cancer. We note the following from *192 the record: (1) all of plaintiff's experts and all of defendants' experts stated that decedent died of testicular cancer; (2) the hospital which treated decedent once the cancer was discovered, Cooper Medical Center, diagnosed germinal cell carcinoma of the testis and gave appropriate treatments to abate this cancer; (3) the HCG blood marker test, specific for diagnosing testicular cancer, revealed a practically certain diagnosis; (4) decedent was sent to Indiana University to be treated under a special regimen for testicular cancer under the auspices of an internationally-known specialist; (5) the cause of death was diagnosed as "testicular germ cell cancer" which had metastasized to other parts of the body including (according to defendants' own expert) the abdominal lymph glands, the liver and part of the lung; (6) defendants' urological experts who specialized in the treatment of testicular cancer did not reach a different conclusion.
On viewing of the judges' decisions to deny defendants' motions both at the time they were made and after the evidence was produced at trial leads us to the inescapable conclusion that the judges were correct. It was not error for them to have denied this last minute discovery, nor was it error not to have rejected the jury's decision that decedent had died of a metastasized testicular cancer.
We further reject defendants' argument that had the last minute oncologist report and witness been accepted, defendants would have been able to show an alternative source of the cancer and thus reduce the "lost chance" recovery factor. See Scafidi v. Seiler, 119 N.J. 93, 97, 113-114, 574 A.2d 398 (1990). Justice Stein, writing for the Court in Scafidi stated:
It should be a self-evident principle of tort law that valuation of allowable damages "is animated by a premise similar to that underlying causation: that a tortfeasor should be charged only with the value of the interest he destroyed." King, Causation and Valuation, supra, 90 Yale L.J. [1353] at 1356 [(1981)]. To the extent that a plaintiff's ultimate harm may have occurred solely by virtue of a preexistent condition, without regard to a tortfeasor's intervening negligence, the defendant's liability for damages should be adjusted to reflect the likelihood of that outcome.
*193 Id. at 112-113, 574 A.2d 398. However, defendants in this case attempted to reduce damages by a medical theory which had no reasonable basis in fact. In the extensive period of discovery permitted in this case before defendants' motion, defendants were obligated to have developed some basis in fact capable of creating a question in the minds of the jurors concerning whether an alternative cause or preexisting condition existed. Id. at 112, 574 A.2d 398. Even when approached from the aspect of the allocation of damages, defendants' motions were properly denied.
The liability judgment against Dr. Marmar and South Jersey Urologic Associates is unimpeachable on this record. It is therefore affirmed.

III  HMO's Responsibility

Plaintiff has requested that we overturn the trial judge's determination to dismiss plaintiff's claims against the HMO. Plaintiff has couched her argument in terms of a contractual duty based upon the promotional literature. We need not analyze the contractual theory advanced by plaintiff, since it is apparent to us that Health Care Plan of New Jersey is responsible for Dr. Marmar's actions on theories of respondeat superior or agency. Plaintiff contended that we should examine the contractual responsibility of the HMO to have seen to it that decedent had been given the HCG blood test; that it should have routinely routed the urologist's reports to Dr. Brumbaugh so that she might have noticed that standard tests had not been performed; and that decedent had not been called back for a follow up visit soon after Dr. Marmar's examination.
However in his treatment of decedent, Dr. Marmar was not acting as an independent contractor for the HMO. Some of the chief indications of the agency relationship were as follows. Neither he nor his group was paid on a fee-for-service basis; rather they were paid on a per capita basis, based upon the number of subscribers to the HMO. They were not free to accept or reject a particular patient. Additional referrals were *194 at the HMO's option. They examined decedent at the HMO's office, as did Dr. Brumbaugh, a full-time employee of the HMO. Of course, the HMO could not practice medicine and therefore the individual examination and diagnostic decisions of Dr. Brumbaugh and Dr. Marmar were professional doctor-patient matters. Yet the overall control exercised by the HMO over both physicians clearly caused Dr. Marmar to be both actually and apparently the agent of the HMO.[4]See David W. Louisell and Harold Williams, Medical Malpractice, ¶ 16.08 (1990) (where authors distinguish liability of an HMO from the less-vulnerable preferred provider organizations.) Where the physician is a direct employee, respondeat superior may be applied. Sloan v. Metropolitan Health Council, 516 N.E.2d 1104 (Ind. *195 Ct.App. 1987); cf. South Bend Osteopathic Hosp., Inc. v. Phillips, 411 N.E.2d 387, 388 (Ind. Ct. App. 1980); but cf. Ross v. Shubert, 180 Ind. App. 402, 388 N.E.2d 623, 629 (1979), petition for reh'g dismissed, 396 N.E.2d 147 (Ind. Ct. App. 1979). But even where there is no direct employment, liability has been predicated on an agency theory. Boyd v. Albert Einstein Medical Center, 377 Pa.Super. 609, 547 A.2d 1229, 1234-1235 (1988). See also Decker v. Saini, No. 88-36178, 1991 WL 277590 (Mich.Cir.Ct. Sept. 17, 1991). In Boyd, summary judgment for the defendant HMO was reversed because the court found factual issues that clearly could have supported a finding of agency. The facts in our case are as strong or stronger, and are undisputed. They require a finding of agency. Boyd's application of the analogy to a hospital staff physician engendering liability for the hospital is in accord with New Jersey law. See Arthur v. St. Peters Hosp., 169 N.J. Super. 575, 581-583, 405 A.2d 443 (Law Div. 1979) (applying the general rule of apparent authority to physicians in hospitals), cf. Alicea v. New Brunswick Theological Seminary, 244 N.J. Super. 119, 129, 581 A.2d 900 (App.Div. 1990), certif. granted, 126 N.J. 329, 598 A.2d 887 (1991). Here, Dr. Marmar certainly would have been at least an agent of the HMO; but from these facts, he might also have been considered a direct employee when he performed his services at the HMO offices for payments based upon the number of HMO subscribers. We therefore hold that under these circumstances both Dr. Marmar (and South Jersey Urologic Associates) and the HMO are responsible to plaintiff for such damages as may be assessed by reason of Dr. Marmar's actions.

IV  Economic Loss

Defendants claim that the damage verdict was tainted in several respects. On plaintiff's wrongful death claim the jury returned a verdict of $1,017,000. On the survival action, the jury awarded the estate $807,290 for decedent's pain and suffering, and awarded $588,042 to plaintiff, as decedent's widow on her per quod claim for the 16 months' loss of consortium. *196 After adding appropriate prejudgment interest and other adjustments, judgment was entered in the total amount of $2,904,240.54.[5]
We first examine the wrongful death damages. Plaintiff's expert made a standard presentation for the computation of wrongful death damages. During his testimony he wrote his assumptions and conclusions on a series of four charts which aided his testimony and facilitated both cross-examination and summation. The defendants' counsel both argued that the charts were not evidential. The urologists' counsel stated that the information was inaccurate and that the calculations "should not be submitted to the jury and are not evidence. The jury will recall his testimony as to what he said and what factors he did or did not include." The HMO's attorney stated that the charts were merely a summary of the expert's written report, and clearly argued to the judge that the jury had the opportunity to listen to the expert's testimony and view what the expert had written on the charts. He said:
[B]ut this is not evidence.... [T]hese writings should [not] be given any more credence than any other testimony in this case. Because if we're going to allow that, I think every witness that comes in here can write their opinions on the board and we can mark those things and we can have them go in....
Inexplicably, over defendants' objection, the court permitted these charts to be marked not merely for identification, but into evidence, and they accompanied the jury into the jury room.[6]
*197 The first page of the exhibit stated the assumptions of the expert concerning decedent's anticipated life span, working life, annual earnings, expected increases in earnings and the discount rate for future earnings. The second page stated the anticipated taxes and personal maintenance that would be deducted from these earnings to compute the amount available to the family, as well as the value of decedent's earned fringe benefits. The witness also noted the number of years in which decedent would be providing services to a family with children under the age of 18, the number of years he would be providing services to his wife with no children in the home, and the number of years of retirement based upon decedent's life expectancy. On page three the expert computed decedent's net earnings for the years 1986 and 1991 and demonstrated how the average net earnings and fringe benefits were calculated. On the last page the following summary appears:

 - Earnings/benefits loss
 - Net of T's [taxes]
 of P.M. [personal maintenance]
 to age  65
 28 X $36,350
 5/1/85
 - Services  to age 70
 $4312 X 32

Tenore v. NuCar Carriers, 67 N.J. 466, 341 A.2d 613 (1975) established the principle that expert testimony concerning the economic effect of a wrongful death was admissible. The expert could testify concerning the discounting of future payments, and could give informed guidelines in assessing the effect of future wage increases, taxes or future inflation or the like. Id. at 473-482, 341 A.2d 613. But the Court in Tenore *198 strictly limited the evidence that could go before the jury. Particularly, the Court considered the effect of "tables prepared by the expert witness purporting to show plaintiff's aggregate damages." It stated:
This is improper for two reasons. In the first place, the tables assume fact findings not within the peculiar expertise of the economic expert. In the second place, the projection of a gross figure before the jury submitted by an expert tends to exert an undue psychological impact leading to the danger of its uncritical acceptance by the jury in the place of its own function in evaluating the proofs.
Id. at 482-483, 341 A.2d 613.
In the case before us it is true that the jury was not given "tables" of damages they could return. If they had been given such tables, at least the jury would have had a choice between varying amounts. Here, the jury was given one answer. On the issue of economic loss, rather than a single total amount, the jury was given the figures "28 X $36,350." This total is $1,017,800, the exact amount returned by the jury. This is the very harm that the Supreme Court warned against in Tenore.
This principle was reiterated in Genovese v. New Jersey Transit Rail Operations, Inc., 234 N.J. Super. 375, 379, 560 A.2d 1272 (App.Div. 1989), certif. denied, 118 N.J. 195, 570 A.2d 960 (1989), where the standard of Tenore was violated by a witness who stated a total wage loss figure. Judge Cohen noted "that the damage verdict of $413,000 was suspiciously near one of the witness's bottom line figures of $425,000, and suggests an effect on the determination." Id. at 379, 560 A.2d 1272. What was merely a suspicion in Genovese is virtually a certainty in the case before us where the verdict returned matched to the dollar the amount in the mistakenly-admitted exhibit.
Defendant contends that the jury did not blindly follow the expert, since they apparently rejected any verdict for the loss of services, counsel, and so forth as permitted by Green v. Bittner, 85 N.J. 1, 4, 424 A.2d 210 (1980). Yet the jury may well have been misled by the wording of the damages interrogatory which asked the jury to state the "economic loss" suffered by the survivors. As we discuss infra, it is difficult for us to *199 believe that where the jury was quite generous in compensating decedent for his pain and suffering and exceedingly generous in compensating the widow on her per quod claim, it would have given no recovery for the loss of services, companionship and the like after decedent's death.
With regard to the economic losses themselves we perceive two errors sufficiently grievous to warrant reversal. First, as noted earlier, the witness was permitted to break down the damages to a simple arithmetical statement and to place this statement before the jury. Second, plaintiff was permitted to mark into evidence the witness' computation and the jury was permitted to take this into the jury room as an exhibit. These sheets, properly used as an aid to the witness' testimony, were not proper exhibits. They were neither real evidence nor demonstrative evidence; they were merely a detailed summary of one aspect of plaintiff's claim.
Such purported evidence should not be confused with a summary of business records or other material, itself evidential, where the summary is admissible as an exception to the best evidence rule, Evid.R. 70(1)(g). See Fried v. Aftec, Inc., 246 N.J. Super. 245, 250-251 n. 3, 587 A.2d 290 (App.Div. 1991). In Fried we stated that the expert's summary of the books and records of defendant depicted in a proposed exhibit could at the discretion of the trial judge be admitted. In the case before us, however, plaintiff was permitted to introduce, not a summary of decedent's earnings records, but rather the expert's opinion of the present value of future earnings after enhancement and deductions determined reasonable by the expert. Since defendants made a timely objection, this exhibit should have been excluded.
Under R. 1:8-8, "if the court so directs in a civil action" the jury may receive materials in addition to the exhibits, namely
a list of the claims made by the parties and of the defenses to such claims, a list of the various items of damage upon which proof was submitted at the trial and a list of the verdicts that may be properly found by the jury.
*200 As we learned from Tenore, however, the "claim" in a wrongful death action is not for a specific dollar amount, or as here, two numbers to be multiplied.

V  Loss of Consortium Award

We next turn to the jury's verdict for the widow's survival action judgment for loss of consortium. Plaintiff was awarded $588,042 "for her loss of consortium and services." Decedent, however, was awarded only $807,290 for his "pain and suffering and other damages ... to the date of his death." It is highly unusual that a loss of consortium award would be as high as this one, when compared to the decedent's physical pain, awareness of impending death, and disability. Defendants would have us explain this loss of consortium award by reference to the judge's charge. They claim that the judge failed to inform the jury that loss of consortium was limited to decedent's actual lifetime, and the size of the award indicates that the jury awarded plaintiff her damages for decedent's expected lifetime. We have searched the charge for some limiting language, and we find none. Therefore, defendants' suggestion is one explanation of the award.
Another, and we think the more logical explanation may be found in the way the interrogatories to the jury were worded. The first question clearly asked for the damages suffered by decedent to the date of his death. The second question asked for an award that "would reasonably, adequately and fairly compensate the decedent's survivors for their economic loss, if any." As we noted earlier the jury returned the exact amount for the economic aspect of the survivor's loss, as testified to by plaintiff's expert, and as set forth in the exhibits mistakenly given to the jury. The judge had charged that financial losses could include
not only actual monies which would have been contributed to or earned for the benefit of the survivors, but it also includes the reasonable value of benefits which would have been received in the nature of services, assistance, and care, as well as training, guidance and counsel that the decedent's survivors would have received had decedent lived. (emphasis added).
*201 This is an accurate statement of the law under Green v. Bittner, supra, 85 N.J. at 11-15, 424 A.2d 210. But the use of the word "services," may well have confused the jurors who may have included the noneconomic loss to the survivors in their answer to the third question. That question asked for an award that would "reasonably, adequately and fairly compensate Linda Dunn for her loss of consortium and services." The problem, of course, is that the jury cannot award to the widow for her per quod claim the noneconomic losses which belong to all of the survivors in the wrongful death action.
Unfortunately, although it is tempting for us to do so, we cannot determine which portion of the per quod award properly belongs to the widow and which portion really constituted the noneconomic damages to be distributed between the widow and children in the wrongful death action. Furthermore, there is always the possibility that the jury mistakenly awarded the widow lifetime loss of consortium, as suggested by defendants. There already must be a new trial on the wrongful death economic issues for the reasons explained earlier, and we must also remand for a new trial on the widow's loss of consortium claim.
This leaves viable only the damages for the decedent's own pain, suffering and related damages. We see nothing in the record that would call this award into question, but we also note that the proof of the wife's damages and the wrongful death economic and noneconomic losses will require a complete retrial of decedent's pain, suffering and other losses. Rather than our directing whether there need be a new trial concerning the decedent's survival action damages, we remand this issue to the Law Division so that the judge who will be supervising the trial can determine, after hearing argument of counsel, whether there should be a new trial on all damage issues or merely on the wrongful death damages and the wife's loss of consortium. If the parties can agree concerning if and how the original jury's award to the widow might be divided between the per *202 quod claim and the noneconomic wrongful death losses, perhaps the trial can be limited to the economic losses, and thus shortened. This is, however, a matter which should and will be committed to the trial judge on remand.
The liability judgment is affirmed; the Health Care Plan of New Jersey is deemed responsible on a principal-agent basis for the acts of Dr. Marmar; the damage judgment for decedent's pain, suffering, and related losses is remanded to the Law Division for consideration whether there should be a comprehensive damage trial; the wrongful death and loss of consortium damage judgments are reversed and the matter is remanded to the Law Division for retrial on these latter issues.
NOTES
[1] One of plaintiff's applications on this appeal was to overturn the denial of her motion, made after Dr. Praiss' testimony later in the case, to reinstate Dr. Praiss as a defendant. When plaintiff's experts were questioned concerning Dr. Praiss' liability (based upon his testimony during depositions) the experts' opined that there was no basis for liability. After the dismissal of the claims against Dr. Praiss, he was called as a witness for the defense and substantially changed his testimony, whereupon plaintiff moved to reinstate the dismissed claims. We have reviewed the explanations given by Dr. Praiss concerning the variance between his trial testimony and his depositions, leading us to understand plaintiff's shock at hearing the trial testimony. In plaintiff's brief and in oral argument before us, however, plaintiff's attorney stated that if the liability judgment was sustained in this appeal against Dr. Marmar, the urologic group and the HMO, plaintiff would abandon her appeal concerning Dr. Praiss. In view of our actions sustaining these aspects of the trial judgment, we will deem plaintiff's application against Dr. Praiss to be abandoned.
[2] In this appeal defendants claim that plaintiff exploited the court's ruling prohibiting them from calling an oncologist as a witness. During summation plaintiff's counsel told the jury that defendants "could have hired their own oncologist. They could have brought in anybody they wanted to bring to tell you in opinion testimony what they thought was wrong with the proofs in this case. They didn't do that." Defendants claim that since they had attempted to call an oncologist, this portion of the summation was unfair. While on its face this statement appears unfair, it is not unfair when read against the trial transcript and defense summation. There, without any substantial basis in the record, defendants urged that the cancer had not been testicular in origin. As defendants had attempted to bring in through the back door the issue they had been prohibited from raising through a competent witness, plaintiff's counsel's quoted response was appropriate.
[3] Defendant's counsel asked the following:

Q. Now, the cancer that was ultimately found in Mr. Dunn was confined to the testicle itself in the scrotum, isn't that correct?
A. I'm not sure what you mean. It started in the right testis, but it had spread to other parts of the body.
* * * * * * * *
Q. Are there occasions when a patient may have two types of cancer simultaneously?
A. That's incredibly rare.
* * * * * * * *
Q. No sir. I agree with you. But you might want to know whether or not this was a testicular cancer and a lung cancer or a pancreatic cancer or some other type of cancer?
A. Not true at all.
Q. You wouldn't do that?
A. Absolutely not. Not with an HCG of 170,000.
* * * * * * * *
Q. Were you aware that at the Cooper Hospital the patient underwent a study of the gallbladder?
A. Yes. They did not yet have his HCG value back at that time.
* * * * * * * *
Q. They also did an ultrasound of the liver?
A. That is correct, but, again, before his HCG was back.
[4] Plaintiff listed other indicia of the agency relationship between the doctors and the HMO as follows: In the contract between the Health Care Plan (HCP) and the urologic group (SJUA), SJUA agreed to abide by HCP policies and procedures; in the contract the number of hours that the SJUA doctors would spend at the HCP Center were agreed upon; each physician provided services at the HCP Center on one day per week; HCP controlled the number of patients seen by the doctors; HCP maintained all patient charts and records, including the specialists' records at the HCP Center; the doctors agreed that they would not let their private practice interfere with their contractual obligations in order to ensure the timeliness and continuity of HCP patient care (thus distinguishing between their private practices and their actions as agents of HCP); HCP had control over the lab facilities and outside consulting services available to the specialist doctors; the specialists were required to use in-house medical services which were available at the HCP Center unless a particular procedure was not available; no outside tests could be ordered by the specialists doctors unless the primary care physician approved those tests; HCP clerks and staff doctors scheduled outside testing, handled the paper work and arranged billings; all appointments for patients were arranged by HCP; in order for HCP patients to be in phone contact with the specialist, HCP had a twenty-four hours a day switchboard to take direct calls from patients; the employment relationship between HCP and the specialist doctors of SJUA lasted for over a three-year period; it was the regular business of HCP to provide health services and this function was performed by the specialist doctors; the literature given to patients listed the specialist doctors, representing that they were affiliated with the HCP; the patients were not put on notice of the independent status of any of the specialists affiliated with HCP; and patients were not permitted to make independent selections of the consultants or specialists by whom they were to be seen.
[5] The jury also determined that there was a 95% chance for decedent's cure and survival if his cancer had been properly diagnosed and successfully treated. The jury ascribed 10% negligence to decedent for his failure to act after his visit with Dr. Marmar. The judge suitably molded the verdicts to incorporate these percentages, as required by Scafidi v. Seiler, supra, 119 N.J. at 111-113, 574 A.2d 398.
[6] During the examination of the expert another problem arose. The jury was permitted to question the expert directly and even ended up referring to the expert as their "teacher." A procedure whereby the jury would be permitted to question a witness after the attorneys had concluded their examination, (albeit by written questions addressed through the judge) was suggested but rejected in 1985 during the deliberations of the Supreme Court Committee on Civil Case Management and Procedures. Although this practice is prevalent in some states, it has never received authorization in New Jersey.

There was no objection to the procedure in this case, and we can discern no separate error arising from the jury's questions and answers. We commend this topic to the Supreme Court Committee on Civil Practice for further consideration and possible recommendations to the Supreme Court.