709 A.2d 205

MICHAEL GREEN, PLAINTIFF–RESPONDENT–CROSS–APPEL-
LANT, v. GENERAL MOTORS CORPORATION, DEFENDANT–
APPELLANT–CROSS–RESPONDENT, AND DELORES PAR-
MENTIER, BREZA BUS SERVICE, INC., AND GOODYEAR
TIRE & RUBBER COMPANY, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued January 27, 1998—Decided March 18, 1998.

510 

Before Judges DREIER, PAUL G. LEVY and WECKER.

*Brett M. Kavanaugh (Kirkland & Ellis)* of the District of Columbia bar, admitted pro hac vice, argued the cause for appellant-cross-respondent (*Tansey, Fanning, Haggerty, Kelly, Convery & Tracy* attorneys; *Thomas F. Tansey* and *James N. Tracy,* on the brief).

*Maurice J. Donovan,* argued the cause for respondent-cross-appellant (*Benjamin M. Del Vento,* attorney; *Benjamin M. Del Vento,* of counsel, *Mr. Donovan,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendant, General Motors Corporation (GM), appeals from a final judgment based upon a jury award in favor of plaintiff, who was driving a GM vehicle when involved in an accident that rendered him a quadriplegic. The jury awarded $13,000,000 for future medical expenses, $149,315 for loss of past income, $305,-860.35 for loss of future income, and $4,000,000 for pain and suffering. Plaintiff's past medical expenses of $312,000 have been stipulated. The total damage award was therefore $17,767,175.35, which with prejudgment interest and costs, and a credit for a settlement with other defendants, totaled $25,110,484.90. GM also appeals from the denial of its motions for a judgment n.o.v., a new trial, or a remittitur. Plaintiff cross-appeals from a portion of the judgment granting defendant a $799,000 credit for amounts received from other defendants who settled after an initial trial had ended in a hung jury. The court deducted this amount from the final judgment after computation of the prejudgment interest noted earlier. Considering that the jury returned a verdict for plaintiff, we will examine the facts in a light favorable to plaintiff, except where any alternative facts may bear upon one of the many issues raised by GM.

On the day of the accident, June 9, 1986, plaintiff, then twenty-four years old and five feet, nine inches tall, was employed as a "car jockey" by Sullivan Chevrolet, an automobile dealership in Roselle Park. He was driving one of his employer's automobiles,

a brand new 1986 Chevrolet Camaro IROC (International Race of Champions) Z28 sports coupe, a two-door vehicle designed and manufactured by defendant.

The Camaro was equipped with a "T-roof," a "luxury option" [1] provided by GM. In 1986, the Camaro was constructed with both an "A-pillar" and a "B-pillar." The A-pillar consisted actually of two pillars and a header which held the front windshield and supported the door hinges. The B-pillar similarly supported the rear window. In the T-roof Camaro there was a steel "center T-bar" welded into the center of the front windshield header and the rear window header. The roof design is called a "T-roof" or "T-top" because the T-bar is the only connection between the A and B pillars. Removable glass panels were supported by the front and rear headers and the T-bar, and provided a convertible-like feeling and driving experience when they were removed. When installed, they provided greater protection from the weather and more security than a canvas-top convertible.

As plaintiff drove the Camaro north on Chandler Avenue with both glass panels inserted and the side windows rolled up, he was accompanied by a friend, Marc Alexander, seated in the front passenger seat. Both plaintiff and Alexander were wearing their seat belts. The legal speed on Chandler Avenue was twenty-five miles per hour; however, plaintiff was apparently greatly exceeding the speed limit. As he came over a slight rise on Chandler Avenue, plaintiff saw a school van proceeding south on Chandler Avenue. According to the driver of the van, her speed was approximately twenty-five miles per hour when she first saw plaintiff's car. The only indication of how much this speed may have actually decreased by the time of the collision, is the van driver's estimate that her speed at contact was five miles per hour.

---

[1] A "luxury option" is distinguished from a "performance option" which enhances the ability of the vehicle to proceed from one point to another beyond that of the base car. Therefore, a "T-roof" as opposed to a standard roof was offered solely for its appearance or comfort.

When plaintiff first observed the school van, it was only one or two car lengths away and was "right in the middle of the road" and "on the center line." We assume, however, that since the driver of the van was more elevated than plaintiff, she may have seen the Camaro slightly before plaintiff could see her. To avoid a head-on collision, plaintiff applied the Camaro's brakes and attempted to steer to the right, however, the left rear side of the Camaro, just behind the driver's-side door, struck the left front corner of the van at a thirty to forty-five degree angle.

The question of the speeds of the van and Camaro were disputed, and the record shows various estimates. Both plaintiff and the passenger estimated the Camaro's speed as between forty and fifty miles per hour. Plaintiff's expert, Donald Phillips, testified that there was insufficient physical evidence to perform a reliable reconstruction of speeds at impact. The van driver estimated plaintiff's speed at seventy-five miles per hour (and testified that plaintiff was on the wrong side of the road and did not decrease his speed). An employee of the Department of Public Works, who was travelling south on Chandler Avenue, 200 feet behind the school van in a dump truck, estimated plaintiff to be proceeding between sixty and seventy miles an hour. Defendant's expert estimated the Camaro's speed at between sixty-seven to seventy-six miles per hour. Therefore, if we accept the van driver's estimate that her vehicle was proceeding at five miles per hour at the time of the impact, and plaintiff's minimum estimate of his speed at forty miles per hour, the lowest closing speed between the two vehicles would have been forty-five miles per hour. If we accept the van driver's estimate of her speed and the maximum speed she and the independent witnesses placed upon the Camaro, the closing speed could have been as high as eighty-one miles per hour.

Plaintiff's medical expert explained that plaintiff had suffered a compression fracture of his spinal cord. Such an injury does not cause instantaneous paralysis, and therefore it "would take a longer time to show all the symptoms of spinal cord injury as

opposed to a sudden disruption of the cord completely through." There was other eyewitness testimony that plaintiff could move his arms and legs immediately after the accident. But, unfortunately, this spinal cord injury quickly and permanently rendered plaintiff a quadriplegic.

Plaintiff's engineering expert's theory of the cause of plaintiff's injury focused on the collapse of the T-bar and "B" frame. When the Camaro hit the school bus to the rear of the driver's door and behind the center of gravity of the car, it spun, causing plaintiff's seat belt to force him back into his seat so that his head was just under the rear portion of the T-bar and B frame which deformed downward onto the back of plaintiff's head. The collapse of the T-bar compressed his spine and caused the compression fracture to his C5, C6, and C7 vertebrae. It was undisputed and is apparent from the photographs that the rear roof of the T-top caved downward in the accident.

Neither plaintiff nor Alexander had any post-accident memory of the accident beyond the instant of impact. Immediately after the accident, however, plaintiff was found outside of the Camaro lying facedown on the ground.[2] A neighbor who heard the crash ran to the site, and as she arrived she saw the driver's side door of the Camaro swing out, following which plaintiff "stepped out of the car." She testified that a "dazed" plaintiff took a "couple of steps," and "fell straight on his face." Defendant, through extensive expert testimony, contended that plaintiff was thrown from the car and suffered his injuries when he landed on his head. Plaintiff's expert testified that the lack of injuries that would have been commensurate with plaintiff so landing made such a scenario a virtual impossibility. This conclusion, coupled with the indepen-

---

[2] Within seconds of the collision, and apparently after plaintiff left the car, it caught fire while Alexander was still sitting inside. Alexander was pulled out by a witness who observed burns on the back of Alexander's head and ears. Alexander testified that he incurred third-degree burns on his arm, neck and face, but medical personnel observed no burns on plaintiff's body, corroborating plaintiff's testimony that he suffered no burns in the accident.

dent witness who saw plaintiff open the door and walk away from the vehicle, certainly provides a sufficient basis for the jury's implicit factual finding that plaintiff was not ejected from the car.

The verdict was taken by special interrogatories. The jury found specifically that the "collapse of the rear roof of the T–Top Camaro caused it to strike the plaintiff on his head." It also found that the "roof collapse" was caused by a "design defect of the T–Roof Camaro." Finally, it determined that the roof collapse was a proximate cause of plaintiff's injuries, and that 100% of his injuries were "solely attributable to the design defect of the T–Roof Camaro." Presumably because of the earlier settlement, the jury was given no interrogatories relating to the responsibility of the driver of the van or her employer, and we have not been informed by the record on appeal whether GM had ever made a cross-claim for contribution against these former defendants, and if so, whether this claim was withdrawn when these defendants were released by plaintiff.

The additional facts concerning the trial, including those relating to the testing of the Camaro, the judge's charge and testimony relating to damages will be discussed when these issues are explored.

Defendant has raised five points on this appeal, some with subparts. We have departed somewhat from defendant's organization of the arguments and will address each point accordingly.

### I. The Judge's Instruction on Speed

GM first contends that the trial judge mistakenly instructed the jury that it could not consider evidence of accident severity and speed in determining whether the Camaro's T-roof design was defective. Before we proceed to the jury instructions, we must examine the nature of plaintiff's claim. Plaintiff has not contended here that GM or the van driver were responsible for the accident. Plaintiff's cause of action against GM was based upon a crashworthiness theory. He claims that whoever might be responsible for the accident, GM was obliged to design a vehicle that

would maintain the integrity of the passenger compartment sufficiently to prevent additional injury to the occupant. If plaintiff had not suffered the injury from the T-bar and B frame deflection, he would have had no claim against GM for the accident that resulted in large part from his faulty driving. Also, if the van driver were to some extent responsible for the accident, GM could have had that responsibility assessed by a timely request to the court to have the jury fix the van driver's percentage responsibility.

Given this narrow framework, we will focus on plaintiff's claim against GM. A design defect does not come into being at the time of an accident. Rather, it occurs when a defective product is placed into the stream of commerce. *See Zaza v. Marquess & Nell, Inc.*, 144 *N.J.* 34, 48–49, 675 *A.2d* 620 (1996), and the cases cited therein. One of the differences between the causes of action for strict liability, negligence, or even some warranty claims is the way each focuses upon this time frame. If we were to look for negligence, we would focus upon the conduct of the manufacturer during the period of design, manufacture and distribution of the Camaro, including its testing and construction. If we were to look at a warranty claim, we would examine the performance of the car and determine whether it was "fit for the ordinary purposes for which" the car was used. *N.J.S.A.* 12A:2–314. A claim for strict liability, however, focuses on the car as it enters the stream of commerce to see whether it was defective. *Zaza, supra,* 144 *N.J.* at 49, 675 *A.2d* 620.

These neat temporal lines have been blurred over the years as we have come to realize that a claim for strict liability is akin to a negligence claim in that the central focus is upon the reasonableness of the manufacturer putting the defective product onto the market. *Id.* at 50, 675 *A.2d* 620. This is different from examining the manufacturer's conduct for negligence before the product was marketed. We do not look to see whether a particular designer acted unreasonably or whether a test engineer failed to perform a particular test, but rather whether a reasonable manufacturer,

knowing the harmful propensities of the product, would have placed it onto the market in its condition. *Ibid.*

Under the New Jersey Products Liability Act, *N.J.S.A.* 2A:58C–1 *et seq.* (PLA or the Act), the causes of action for negligence, strict liability and implied warranty have been consolidated into a single product liability cause of action, the essence of which is strict liability. *Jurado v. Western Gear Works,* 131 *N.J.* 375, 384–85, 619 *A.*2d 1312 (1993); *Tirrell v. Navistar Int'l, Inc.,* 248 *N.J.Super.* 390, 398–99 n. 5, 591 *A.*2d 643 (App.Div.), *certif. denied,* 126 *N.J.* 390, 599 *A.*2d 166 (1991). The Act, however, was non-exclusive, and the Legislature intended that the existing common law would continue to be applied, except where specifically changed by the Act. Senate Judiciary Committee Statement to Senate Bill No. 2805 (1987), *reprinted following N.J.S.A.* 2A:58C–1. The Act incorporated the standard from *Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 169, 406 *A.*2d 140 (1979), which required: "If at the time the seller distributes a product, it is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes . . . the seller shall be responsible for the ensuing damages." The PLA used a shorthand reference to this standard in *N.J.S.A.* 2A:58C–2, but as is clear from the Senate Judiciary Committee Statement, no change in the law was intended.

Thus, in determining whether the Camaro was defective, a jury must determine the risks and alternatives that should have been known to a reasonable manufacturer, and then assess whether the manufacturer discharged its duty to provide a "reasonably fit, suitable and safe" vehicle.[3] To do this, the jury employs a risk-utility analysis. *Jurado v. Western Gear Works, supra,* 131 *N.J.* at 385, 619 *A.*2d 1312. Although there are seven listed factors in the classical statement of the risk-utility analysis, see

---

[3] *Suter v. San Angelo Foundry & Mach. Co., supra,* also teaches us that "[f]itness and suitability are terms synonymous with safety." 81 *N.J.* at 169, 406 *A.*2d 140. Thus the sole standard in the usual case is reasonable safety.

*Cepeda v. Cumberland Eng'g Co.*, 76 *N.J.* 152, 174, 386 *A.*2d 816 (1978) and its progeny, the prevalent view is that, unless one or more of the other factors might be relevant in a particular case, the issue upon which most claims will turn is the proof by plaintiff of a "reasonable alternative design ... the omission ... [of which] renders the product not reasonably safe." *Restatement (Third) of Torts: Products Liability* § 2(b) (Proposed Final Draft, April 1, 1997).[4] *See Congiusti v. Ingersoll–Rand Co., Inc.*, 306 *N.J.Super.* 126, 138–39, 703 *A.*2d 340 (App.Div.1997); *Grzanka v. Pfeifer*, 301 *N.J.Super.* 563, 579, 694 *A.*2d 295 (App.Div.), *certif. denied*, 152 *N.J.* 189, 704 *A.*2d 19 (1997); *Smith v. Keller Ladder Co.*, 275 *N.J.Super.* 280, 283–84, 645 *A.*2d 1269 (App.Div.1994).

Plaintiff's premise in this case is that although he was negligent in the operation of the vehicle, his injuries did not flow from this negligence, but rather from the faulty design of the Camaro which should have protected plaintiff under the circumstances of this accident. Defendant counters with a claim that the speed of the vehicle in this case, which may have been over double the legal limit, was a factor that the jury should have considered in determining whether the Camaro was defectively designed. The trial judge rejected defendant's view after a long and contentious argument. The judge charged the jury that the speed of the vehicle, the use of a seat belt, the use of the vehicle, crossing lanes of traffic and the like could be considered by the jury only on the issue of proximate cause, that is, the allocation of the cause of plaintiff's injuries or of damages between those responsible for the accident and the alleged crashworthiness deficit. Speed could not

---

4 The full text of § 2(b) of the *Restatement (Third) of Torts: Products Liability, supra,* is that a product

 is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

In instances where other risk-utility factors need be considered, they are not excluded by this formulation. *See id.* at cmts. b and e.

be considered on the issue of whether the Camaro was defectively designed.

The applicable portions of the charge on this subject read as follows:

In this case the plaintiff alleges and has the burden of proving that the 1986 T-top Camaro was defectively designed because it was not crashworthy and that this defect was a proximate cause of plaintiff's injuries. The defendant, by way of response, denies that the vehicle was defectively designed and contends that Michael Green's injuries were caused by his own conduct.

In this regard, please keep in mind that the conduct of the plaintiff concerning speed, seat belt use, use of the vehicle, crossing the lanes of traffic, etc., can only be considered by you on the issue of proximate cause. It cannot be considered by you as to whether the Camaro was defective.

. . . .

... [E]ven if you determine that the Camaro roof system was defective, you must go on to consider whether the defect was a proximate cause of plaintiff's injuries. Plaintiff must prove by a preponderance of the evidence that any defect in the Camaro roof system, whatever you may find it to be, was a proximate cause of his injuries.

By proximate cause I mean that the defect in the Camaro was a substantial factor that singly or in combination with another cause brought about plaintiff's injuries.... You may consider whether the speed of the Camaro at the time that it collided with the bus and the resulting severity of the accident was the proximate cause or the sole proximate cause of plaintiff's injuries.

. . . .

In relation to speed, ... you may take into account that except where otherwise posted it shall be lawful for the driver of a vehicle to drive at a speed not exceeding 25 miles per hour in any business or residential zone. Please remember that speed is only relevant on the subject of proximate cause and not on the question of whether the product was defective.

Defendant reiterated its objection at the new trial motion, but the judge again noted that speed was not a factor in this case.

With respect to the speed of the vehicle, I don't think I ever suggested certainly that the jury could not consider the severity of the impact on the issue of crashworthiness or the design defect, but certainly the issue of speed, how fast the vehicle was going, was not pertinent to the design of this particular car. It was not relevant. Certainly [it was] relevant on the issue of proximate cause, that was my determination then, it is still my determination today.

The speed of this vehicle was not relevant as to how the vehicle was designed, when it was designed and all of the factors that were taken into account by the design people, the design team, the design managers, and the design engineers. They had a number of things to consider, but what Mr. Green did on the date of

this accident is not pertinent, not relevant to whether that design was defective or not.

We agree with the trial judge. When GM placed this vehicle on the market, it certainly knew that it would be driven at lawful speeds up to fifty-five miles per hour and in some states sixty-five miles per hour. It also knew that the vehicle might collide with another vehicle similarly operated. The experts in this case testified to the crash-testing of vehicles with a purpose of maximizing the safety of the occupants. The experts further testified that the only relevant speed factor in an accident between vehicles of the same size and weight[5] is the closing speed between the two vehicles, there being no difference between a vehicle hitting a fixed object at eighty miles an hour and two vehicles travelling forty miles per hour in opposite directions hitting each other. The closing speed between plaintiff's vehicle and the school van of between forty-five and eighty-one miles per hour is well within the range reasonably to be expected in the design of the Camaro.

Plaintiff's expert testified that closing speeds of up to 110 miles per hour must be anticipated and designed for by automobile manufacturers, and the speed in this case was well within the realm of anticipated accident speeds that a responsible manufacturer would and does consider in designing an automobile that is reasonably crashworthy. While GM's expert did not discuss particular speeds, he testified that all accident circumstances should be considered in evaluating crashworthiness. He acknowledged that two vehicles travelling within the legal limits could have a 110 mile per hour closing speed. GM's estimate of the closing speed in this case was at least thirty miles per hour under the 110 mile per hour speed. We see, therefore, that if GM was required to

---

[5] There would be a difference in impact depending on the mass of the vehicle that was travelling at the particular speed, since the force exerted is dependent on both the mass and speed of the vehicle. For example, if a car is hit by a freight train going ten miles per hour or an insect flying or being blown at the same speed against the car, the damage to the car is devastating in the first case and non-existent in the second. This aspect of the cause of the damage to the Camaro was not explored at trial.

design a reasonably safe vehicle for its intended and reasonably foreseeable use, it should, if possible, have designed a vehicle that could reasonably withstand a crash at considerably higher speeds than in this case.

Also, the speed limit and manner of driving were irrelevant to the plaintiff's crashworthiness issue. As stated in *Green v. Sterling Extruder Corp.*, 95 *N.J.* 263, 471 *A.*2d 15 (1984), once the defendant has "a duty to protect persons from the consequences of their own foreseeable faulty conduct, it makes no sense to deny recovery because of the nature of the plaintiff's conduct." *Id.* at 272, 471 *A.*2d 15 (quoting Patricia Marschall, *"An Obvious Wrong Does Not Make a Right: Manufacturer's Liability for Patently Dangerous Products,"* 48 *N.Y.U. L.Rev.* 1065, 1088 (1973)). *See also Ramos v. Silent Hoist & Crane Co.*, 256 *N.J.Super.* 467, 481, 607 *A.*2d 667 (App.Div.1992) (noting that to appraise contributory negligence against a plaintiff would "excuse the very conduct that gives rise to strict liability on the part of the manufacturer" as well as to the manufacturer's negligence). Thus, the Camaro had to be designed, if feasible, to protect the integrity of the passenger compartment in an accident at a closing speed that could be reasonably anticipated by the manufacturer. If it was not, then the Camaro was defective, regardless of plaintiff's driving speed within such protectable limits. The speed at which plaintiff was driving might theoretically have been greater than that at which plaintiff's reasonable alternative designs would have afforded protection, but such was not the testimony. If the speed was beyond the design limits, speed would have been a proper factor to determine proximate cause and a later apportionment of liability. Since the closing speed in this case was recognized to be well within the acknowledged design parameters, and the passenger compartment remained intact, with the exception of the deforming T-bar roof, the trial judge correctly ruled that speed was not a factor in determining whether the vehicle was defective.

As noted in the portions of the charge we quoted earlier, the trial judge did not rule out speed as a factor in the case.

Plaintiff's speed was a definite factor in bringing about the accident, and the jury was told specifically and carefully that it could consider plaintiff's speed. However, speed properly was a factor solely in determining proximate cause, and this was carefully explained to the jury.[6] Insofar as plaintiff's injuries were caused solely by the product defect, speed was not relevant.

Defendant urges that the argument against consideration of speed with respect to the defect was overwhelmingly rejected in *Huddell v. Levin,* 537 *F.*2d 726 (3d Cir.1976). The speed issue in *Huddell* was somewhat different from the one before us, but we will analyze it, analogizing the defective seat belt and headrest in *Huddell* with the alleged defective roof design in the case before us. The plaintiff in *Huddell* argued that if a seat belt and headrest design was faulty "it remains faulty whether an accident occurs at 5 m.p.h. or 100 m.p.h." *Id.* at 740. The Third Circuit rejected this argument, stating that the severity of the impact went to the heart of the question of a defect "in terms of the ordinary purposes for which the product, the head restraint, was designed." *Ibid.* The *Huddell* court reasoned that if the seat belt or head restraint failed to protect the wearer in a five mile per hour crash, there would be an inference of a defect, but that if the seat belt failed in a 100 mile per hour crash, the same argument might lose its validity. "At least in the context of safety design, we see no meaningful way to evaluate the defectiveness *vel non* of a product except in the context of a particular risk." *Id.* at 741.

The problem with the *Huddell* analysis is that it failed to assess the defect and any reasonable alternatives asserted by the plaintiff against the reasonably anticipated use of the product. Although

---

[6] As is explained later in more detail, the limitation of the type of plaintiff's conduct that can be considered to offset responsibility for a design defect precluded the jury from considering any conduct by plaintiff other than that he unreasonably proceeded in the face of the known danger of the defective design. *See Cartel Capital Corp. v. Fireco of New Jersey,* 81 *N.J.* 548, 562–63, 410 *A.*2d 674 (1980); *Suter v. San Angelo Foundry & Machine Co., supra,* 81 *N.J.* at 158, 406 *A.*2d 140.

the manufacturer is not an insurer of the safety of the occupant of a vehicle, the fifty to sixty mile per hour rear-end hit of the 1970 Chevrolet Nova in *Huddell* certainly was a foreseeable accident, and the reasonable alternative design suggested by the plaintiff of a larger and more deformable head restraint correctly persuaded the *Huddell* court that there was sufficient evidence to submit the issue of defect to the jury. *Id.* at 736. We must respectfully disagree, however, with the speed analysis in *Huddell.* The ten versus the hundred mile per hour rear-end collision comparison was appropriate, because a hundred mile per hour hit would be outside of the design parameters. But the anticipatable fifty to sixty mile per hour rear-end hit, with a reasonable alternative design presented, causes us to question whether speed should have been a factor in determining whether there was a defect in the design of the *Huddell* seat belt/headrest assembly.[7] Therefore, we depart from *Huddell* and agree with the trial judge's decision in this case to limit the consideration of speed to the issue of proximate cause of plaintiff's injuries.

## II. Reasonable Alternative Design

Plaintiff accepted his duty under the risk-utility formulation (or the alternative *Restatement* formulation) to present a reasonable alternative design to the jury. Plaintiff came forward with two such designs, both of which he contended would have prevented the B-pillar and roof deformity. The first alternative challenged the fundamental safety of the T-bar configuration itself and merely claimed that the basic Camaro design with a standard full sheet-metal roof provided sufficient stability to maintain the integrity of the passenger compartment, even in an oblique side

---

[7] We are not, however, privy to all of the proofs in *Huddell* with respect to the technology available for the construction of the 1970 Chevrolet Nova. If the injury and death of the plaintiff in *Huddell* in a fifty to sixty mile per hour rear-end hit could not reasonably have been avoided by the use of the technology of the time, then the factor of speed would very much be a factor in determining the reasonableness of the design. Available technology, however, is not an issue in the case before us.

impact such as in the case before us. GM's own tests confirmed this claim. With this design, plaintiff argued that if there were no other design that would have maintained the roof's stability, then the risk of an injury such as this far outweighed any social utility of the T-bar and glass roof. This alternative of not marketing the specific product at all is explored in comment e of the *Restatement (Third) of Torts: Products Liability* § 2(b), *supra*.

Plaintiff's second alternative design posited two stabilizing bars, one connecting the left corners of the A (front) and B (rear) pillars, and the second connecting the right corners of these pillars. The sheet metal roof still would be replaced by two glass panels up to the T-bar, but the roof pillars and T-bar would have been stabilized by the additional side bars.

Defendant's opposition to this configuration was interesting. It asserted that the use of these two additional supports was theoretical at best in that they had never been tested, and that there was no showing that they would have protected the passenger compartment against the roof deformities from the side impact. Note that the redrafted comment f to the *Restatement (Third) of Torts: Products Liability* § 2, after noting that the requirement of an expert depends upon the feasibility and understandability of the alternative design, states:

Subsection (b) does not, however, require the plaintiff to produce a prototype in order to make out a prima facie case. Thus, qualified expert testimony on the issue suffices, even though an expert has produced no prototype, if it reasonably supports the conclusion that a reasonable alternative design could have been practically adopted at the time of sale.

Comment f also supports plaintiff's claim that the jury could consider his expert's suggestion that the original roof design without the T-bar construction was an alternative which would have protected plaintiff. The comment notes:

Furthermore, other products already available on the market may serve the same or very similar function at lower risk and at comparable cost. Such products may serve as reasonable alternatives to the product in question.

Obviously, the jury accepted plaintiff's alternative design evidence and disagreed with defendant.

Moreover, following the verdict in this case and the attendant press coverage, plaintiff's attorneys were contacted by attorneys representing a plaintiff in a similar accident in Tennessee where defendant had apparently been more forthcoming in its discovery. Although plaintiff in this case had requested all testing of alternative designs, defendant did not supply plaintiff with the testing of a design remarkably similar to the one suggested by plaintiff's expert.[8]

Defendant also claimed that plaintiff's design was different because plaintiff's expert had suggested the two side rails in addition to the T-bar. Defendant's own design had the two side rails suggested by plaintiff's expert, but instead of the welded T-bar in plaintiff's design, defendant's design had the glass panels merely being separated by a simulated T-bar that apparently was not structurally connected to the front and rear pillars. We find this distinction unavailing, since if the sidebars alone protected the passenger compartment, plaintiff's expert's suggestion of the sidebars and a connected T-bar would have provided more protection, not less. The revelation of defendant's own alternative design akin to the one suggested by plaintiff, well supported by defendant's own testing, should put to rest the issue of a reasonable alternative design in this case.

### III. Burden of Proving Allocation of Injury

Defendant raises another issue arising from *Huddell v. Levin, supra*. GM contends that plaintiff failed to discharge his burden of allocating the injuries between the accident, for which plaintiff and/or the van driver were responsible, and the design defect for which GM was responsible. Defendant contends that although the

---

[8] Because defendant was still arguing on this appeal that the alternative of inserting side rails should have been rejected because it had not been tested, plaintiff successfully moved before us to expand the record to include the extensive data the attorneys had received from the Tennessee plaintiff. Defendant first claimed that all of this material had been produced for plaintiff, but then, after searching its own records, withdrew the explanation.

judge placed the burden upon plaintiff in accordance with *Huddell v. Levin,* the apportionment proofs were non-existent.

We disagree for two reasons. First, between plaintiff and defendant, the jury found that plaintiff's injuries were caused totally by the defective product. Therefore, there was nothing to apportion. This finding has an ample basis in fact. But for the crushing injury to plaintiff's spine, plaintiff was virtually uninjured; he literally walked away from the accident, not even suffering the burns that affected Alexander who had to be helped from the car. Furthermore, plaintiff's own negligence with respect to his claim of a defective product is limited to whether he unreasonably proceeded in the face of a known danger. *Suter v. San Angelo Foundry & Mach. Co., supra,* 81 *N.J.* at 158–60, 406 *A.*2d 140. Such "known danger" was not the obviously known consequences of plaintiff's speed, but rather must be that posed by the faulty roof design. *See Cartel Capital Corp. v. Fireco of New Jersey, supra,* 81 *N.J.* at 562–63, 410 *A.*2d 674. (There, plaintiff's employees would have had to have been aware of the defective fire extinguisher, not merely the obvious danger of placing grease-soaked paper plates in front of an open-hearth fire.)

The second basis for rejecting defendant's claim warrants detailed discussion since it has been left open by *Crispin v. Volkswagenwerk AG,* 248 *N.J.Super.* 540, 569 n. 1, 591 *A.*2d 966 (App.Div.), *certif. denied,* 126 *N.J.* 385, 599 *A.*2d 162 (1991). The uncertainty concerning where New Jersey places the burden of proof for allocating causation of injuries in a crashworthiness case has attracted national attention. The Reporters' Note for the *Restatement (Third) of Torts: Products Liability* discusses two approaches to the burden of proof question. The annotation to comment d of § 16 states the majority view as the *"Fox–Mitchell* [9] approach," which places the burden of allocating the harm caused by the accident upon the defendant. The opposing minority view

---

[9] *Mitchell v. Volkswagenwerk AG,* 669 *F.*2d 1199 (8th Cir.1982); *Fox v. Ford Motor Co.,* 575 *F.*2d 774 (10th Cir.1978).

is the *Huddell* approach under which "[i]f the plaintiff is unable to quantify the increased harm, even if the plaintiff can establish that some increased harm was caused by the defendant, the plaintiff is unable to recover." *Restatement (Third) of Torts: Products Liability* § 16, Reporters' Note, cmt. d (Proposed Final Draft, April 1, 1997) [hereinafter Reporters' Note].

In a thirteen-page discussion, the Reporters list twenty-three states, including New Jersey, as either adopting the *Fox–Mitchell* approach or likely to do so. Only six states appear to follow the *Huddell* approach.[10] The Reporters' Note at comment d of § 16 cites the footnote in *Crispin, supra,* noting the open issue in New Jersey, in which Judge Baime states:

> A rule placing upon the defendant the burden of proof with respect to the apportionment of damages may be more in line with our Supreme Court's recent decision in *Scafidi v. Seiler,* 119 *N.J.* 93, 111–113, 574 *A.2d* 398 (1990). *See also Fosgate v. Corona,* 66 *N.J.* 268, 272–273, 330 *A.2d* 355 (1974). However, this issue is not before us and we need not resolve it.
>
> [248 *N.J.Super.* at 569 n. 1, 591 *A.2d* 966].

Lastly, the Reporters' Note points out that since *Crispin* the issue has been treated in only two trial court opinions, *McLaughlin v. Nissan Motor Corp., U.S.A.,* 267 *N.J.Super.* 130, 135, 630 *A.2d* 857 (Law Div.1993), and *Thornton v. General Motors Corp.,* 280 *N.J.Super.* 295, 299–303, 655 *A.2d* 107 (Law Div.1994). *McLaughlin* follows the *Huddell* approach; *Thornton* rejects it.

The Supreme Court in *Waterson v. General Motors Corp.,* 111 *N.J.* 238, 544 *A.2d* 357 (1988), treats a similar but not identical issue of the allocation of injuries between the manufacturer of a defective automobile and a motorist who failed to wear a seat belt. While the basis of liability in *Waterson* may be different from the

---

10 The Reporters' Note at comment d further states that the *Fox–Mitchell* approach, which is the source of § 16(c) of the new *Restatement,* "reflects the more recent developments." They also explain that much of the authority stems from federal courts, assuming how the courts of the state in which they sit would hold. Of decisions actually rendered by state appellate courts, thirteen favor the *Restatement* rule and only three states (all intermediate appellate court decisions) favor the *Huddell* position.

case before us, both involve a second injury. In the seat belt case, the Court placed the burden upon "defendant [to] . . . demonstrate that nonuse of a seat belt increased the extent or severity of plaintiff's injury." *Id.* at 269, 544 *A.*2d 357. See also *Schwarze v. Mulrooney,* 291 *N.J.Super.* 530, 540–41, 677 *A.*2d 1144 (App.Div. 1996), where in a second injury case involving a shifting load, Judge Baime determined that the defendant had the burden to present evidence enabling the jury to apportion damages. *Cf. Thorn v. Travel Care, Inc.,* 296 *N.J.Super.* 341, 349, 686 *A.*2d 1234 (App.Div.1997) (another seat belt case placing the burden on defendant). Although the Supreme Court has not yet spoken definitively on this subject, we agree with Judge Baime and the *Restatement* Reporters that the direction indicated by the Supreme Court in such cases as *Scafidi, supra,* and *Fosgate, supra,* is with the majority of state courts that have considered the allocation issue.

It thus appears to us that we should apply sub-sections 16(b) and (c) of the *Restatement (Third) of Torts: Products Liability.* These sections read:

(b) If proof supports a determination of the harm that would have resulted from other causes in the absence of the product defect, the product seller's liability is limited to the increased harm attributable solely to the product defect.

(c) If proof does not support a determination under Subsection (b) of the harm that would have resulted in the absence of the product defect, the product seller is liable for all of the plaintiff's harm attributable to the defect and other causes.[11]

We therefore reject defendant's claim that plaintiff did not carry his burden of proof, since the court's decision to follow *Huddell v. Levin* and place the burden on plaintiff was in error. However, as this error favored defendant, it was clearly harmless. Placing the

---

[11] Note that the *Restatement (Third) of Torts: Products Liability* § 16(c) "does not formally shift any burden of proof to the defendant. Its effect is that, if the plaintiff has established that the product defect increased the harm over and above that which the plaintiff would have suffered had the product been nondefective, and if at the close of the case proof does not support a determination of the harm that would have resulted in the absence of the product defect then the defendant is liable for all the harm suffered by the plaintiff." Reporters' Note, § 16(c), cmt. d.

burden on defendant, where it properly belongs, reveals that defendant did not meet its burden, and therefore no allocation evidence was required of plaintiff.

## IV. *Charge on a Duty to Inspect*

■ Defendant next raises an objection to a portion of the judge's charge relating to defendant's duty to inspect and test the T-roof designed car. Inexplicably, after the judge charged the risk-utility elements for a design defect; GM's obligation to produce a product fit, suitable and safe; and plaintiff's obligation to prove an alternative safer design, the judge added an additional charge. He stated:

> In determining whether the Camaro was defective, you may take into account that a manufacturer is also under a duty to make reasonable inspection and tests of its products for the purpose of locating obvious or hidden but discoverable defects in the product.

The charge continued for nearly two pages in the transcript, discussing GM's duty to exercise reasonable care in the testing of the Camaro and posing the question of what a reasonable manufacturer would or would not have done under the circumstances.

Notwithstanding the court having given this charge, which obviously did not relate to a design defect, but rather to negligence,[12] none of the special jury interrogatories dealt with this issue. Furthermore, the record is replete during both the plaintiff's and defendant's cases with reference to GM's extensive testing of the Camaro both with and without the T-bar roof. We are at a loss therefore to understand why the trial judge gave this portion of his charge.

■ It is clear that a breach of any duty to test, insofar as it may exist, is relevant to a negligence cause of action, or in a rare case to a manufacturing defect, but not a design defect claim. As defendant correctly notes, a product that is not defective and has

---

[12] The charge itself is taken from a former model charge to be given in a manufacturing defect case where a plaintiff's claim is based upon a negligence theory of failure to inspect.

not been tested at all remains free of a defect. Similarly, a defective product that has been extensively tested is still defective. Proof of a failure to test or of inadequate testing may be evidential as an explanation of why a design was defective, but it is not in itself proof of a separate basis for liability.[13]

The charge was relevant only to appraise an aspect of the manufacturer's conduct which was not properly in issue. The Supreme Court has made it clear that the manufacturer's negligence is not an issue in a strict liability case. In *Waterson v. General Motors Corp., supra,* the Court stated:

> The essence of an action in strict liability is that the injured party is relieved of the burden of proving the manufacturer's negligence. The injured party need prove, for the party's prima facie case, only that the injury-causing product was unsafe or unfit for its intended or foreseeable use at the time it left the manufacturer's control and that the injuries sustained arose from the unsafe or unfit condition of the product.

[111 *N.J.* at 267–68, 544 *A.*2d 357].

The Senate Judiciary Committee Statement, *supra,* accompanying the PLA made it clear that the initial sections define the new product liability action as falling within the categories of manufacturing defects, warning defects, and design defects, and "[e]xcept as modified by the provisions of sections 3 and 4, the elements of these causes of action are to be determined according to the existing common law of the State." Negligence had long been subsumed within strict liability prior to the PLA. *See Realmuto v.*

---

[13] Testing might also have some relevance in the area of a manufacturing defect on the issue of what was a reasonably safe product, or the unavoidably unsafe product defense, *N.J.S.A.* 2A:58C–3a(3). Similarly, in a warning defect case, testing could be relevant if a plaintiff wished to explain that adequate testing would have caused the manufacturer to warn of a particular problem which was discoverable, or if a defendant wished to claim that extensive testing did not reveal a problem and therefore the manufacturer could not reasonably have known of the problem, and there was thus no necessity to warn. (While here plaintiff did claim that defendant performed inadequate side impact testing, the defect in design was not dependent on this testing). It is also possible that if the defendant were relying upon a state-of-the-art defense under *N.J.S.A.* 2A:58C–3a(1), testing might in some way indicate that there was no practical and technically feasible alternative design.

*Straub Motors, Inc.,* 65 *N.J.* 336, 322 *A.2d* 440 (1974); *Collins v. Uniroyal, Inc.,* 64 *N.J.* 260, 315 *A.2d* 16 (1974); *Heavner v. Uniroyal, Inc.,* 63 *N.J.* 130, 305 *A.2d* 412 (1973). Thus, if negligence principles were not to have been applied prior to the Act, as stated in *Waterson,* the same rule would apply to a design defect claim under the Act.

We have analyzed this aspect of the charge in detail to see whether it might reasonably have influenced the jury against defendant. The judge informed counsel that he was including this charge as a consideration for the reasonableness of defendant's conduct in designing the car as it did. GM did not specifically object to the charge, although at one point defendant requested the court only to give the model charge as testing was "captured by the risk-utility factors." We read this objection to have told the court that testing was a fair consideration, but that a separate charge was unnecessary. The objection certainly would not put the judge on notice of defendant's opposition to any charge at all related to the subject of testing. Plaintiff's summation referred to a lack of testing of the T-bar roof, not as a separate basis of liability, but only as an attack upon defendant's having permitted the defective vehicle to be placed on the market and defendant having an inadequate basis to certify that the T-roof Camaro complied with federal motor vehicle safety standards.

We have read this section of the charge in the context of the charge conference, the charge as given, the objections and the interrogatories given to the jury which, as we noted, contain no reference to the testing, but looked only to the issues of defect and proximate cause. Pursuant to *R.* 1:7–2, it was defendant's obligation to make a specific objection to this aspect of the charge before the jury retired, and "no party may urge as error any portion of the charge to the jury or omissions therefrom unless objections are made thereto before the jury retires to consider its verdict." *Ibid.* We are, of course, cognizant of our power to notice plain error, but in the context of the jury's findings, the addition of this charge concerning the duty to test has not been shown "to

have been clearly capable of producing an unjust result." *R.* 2:10–2. The charge failed to affect "a substantial right of plaintiff." *Atlas v. Silvan,* 128 *N.J.Super.* 247, 252, 319 *A.2d* 758 (App.Div. 1974). We will reverse on appeal for errors that lacked an objection only if the errors " 'cut mortally into the substantive rights of the defendant.' " *State v. Shomo,* 129 *N.J.* 248, 260, 609 *A.2d* 394 (1992) (quoting *State v. Harper,* 128 *N.J.Super.* 270, 277, 319 *A.2d* 771 (App.Div.), *certif. denied,* 65 *N.J.* 574, 325 *A.2d* 708 (1974)). We therefore determine this error to be harmless. *R.* 2:10–2.

## V. Damages

We now proceed to assess the damage award. Defendant objects to several aspects of this award: first, the award of interest on future damages; second, the award of prejudgment interest for two years during which plaintiff allegedly delayed the trial; and third, the apparent failure of the jury to discount plaintiff's award for future medical expenses to their present value. On cross-appeal, plaintiff objects to the court having granted the $789,000 offset for the former co-defendants' settlement.

### a. Interest on Future Damages

With regard to the $13,000,000 award for future care and medical expenses and the $305,860.35 award for future lost income, GM objects to the award of prejudgment interest. In truth, the award of prejudgment interest for amounts that will not be incurred by plaintiff until after judgment is "questionable." *Ruff v. Weintraub,* 105 *N.J.* 233, 245, 519 *A.2d* 1384 (1987). The Court explained away the logical inconsistency. It first recognized the validity of the argument that the damages would not accrue until after judgment, but then stated:

> However, the public interest in encouraging settlements is an adequate independent basis for the application of the prejudgment interest rule in this case. Thus, this is not an "exceptional" case, as that term has been interpreted [under *R.* 4:42–11(b) ].

> Since rule 4:42–11(b) allows for the suspension of prejudgment interest only in "exceptional cases," the trial court's assessment of prejudgment interest on the entire award was proper in this case.
>
> [*Id.* at 245, 519 *A*.2d 1384].

Where the awards are modest, we can understand the Supreme Court's policy to encourage settlement. Perhaps an unstated additional reason is to defray plaintiff's attorney's fees attributable to sums that plaintiff will be forced to pay third parties or which would reduce a compensatory stream of lost future income.[14] In the case before us, however, of the $17,767,175.35 judgment returned by the jury, $13,305,860.35 represented future medical expenses and future lost earnings. Based upon the proof submitted to the court concerning the interest for the seven-year period commencing six months after the date of the filing of the complaint through the date of judgment, *R.* 4:42–11(b), the prejudgment interest on the portions of the losses that plaintiff *had not yet suffered* exceeded $8,500,000.

This is an exceptional case. It took seven years to reach trial, but the interest on all sums that accrued during this seven-year period is not questioned by defendant. This was a hotly contested case on the issue of liability, and whatever we may think of defendant's position on the merits of the case, an assessment of prejudgment interest of this magnitude amounts to a penalty bordering on confiscation.[15] This is especially so when we look at

---

[14] This court has previously also justified the assessment of prejudgment interest for future loss on the theory that the "interest factor simply covers the value of the award for the period during which the defendants had the use of the moneys to which plaintiffs are found to be entitled." *Statham v. Bush*, 253 *N.J.Super.* 607, 617, 602 *A.*2d 779 (App.Div.1992) (quoting *Busik v. Levine*, 63 *N.J.* 351, 360, 307 *A.*2d 571 (1973)). Such reasoning does not apply, at least under the facts of this case. A plaintiff loses nothing when post-judgment losses are paid without interest. This aspect of the justification for such interest was apparently abandoned in *Ruff. See Statham, supra,* 253 *N.J.Super.* at 618, 602 *A.*2d 779 (discussing *Ruff, supra,* 105 *N.J.* at 245, 519 *A.*2d 1384).

[15] *See* Pressler, *Current N.J. Court Rules,* comment 8 on *R.* 4:42–11 (1997) (stating that suspension of prejudgment interest should be cautiously exercised with consideration of the underlying purpose of *R.* 4:42–11, "namely that

the fact that the award spans periods of time when the interest rates were seven and one-half, eight or even eight and one-half percent, although the actual post-judgment rates, which will properly affect post-judgment payments due to plaintiff, will be far less.

■ The Supreme Court in *Ruff* recognized this prejudgment interest as a fiction, but determined that a *reasonable* award furthers the interests of speedy trials and calendar control and provides a payment to needy plaintiffs. *See* 105 *N.J.* at 245, 519 *A.2d* 1384. We note that defendant properly did not include within its objections the prejudgment interest on the $4,000,000 payment for plaintiff's future pain and suffering. *See Friedman v. C & S Car Serv.*, 108 *N.J.* 72, 78, 527 *A.2d* 871 (1987). But it appears reasonable to us that the payment of the prejudgment interest on this $4,000,000 for the seven-year prejudgment period is sufficient to further the goals expressed by the Supreme Court in *Ruff.* The denial or suspension of prejudgment interest is left to the sound discretion of the trial judge, based on considerations of equity, fairness and justice, viewed in the factual context of the case at hand. *Dall'Ava v. H.W. Porter Co.*, 199 *N.J.Super.* 127, 129–31, 488 *A.2d* 1036 (App.Div.1985). In addition, we may exercise our original jurisdiction. *R.* 2:10–5. In this "exceptional case," we therefore vacate the prejudgment interest on the awards for future medical expenses and lost income.[16]

---

prejudgment interest is not a penalty but is rather a payment for the use of money"). We take this statement as applying principally to pre-judgment damages because a defendant has not withheld reimbursing a plaintiff for any sums that the plaintiff has not yet advanced.

[16] We cannot help but note that in the Punitive Damage Act, *N.J.S.A.* 2A:15–5.14b, the Legislature has placed a $350,000 cap on the award of punitive damages. Since, as we have noted earlier, interest on future medical expenses and earnings has been upheld solely on the basis of an inducement to settle, and constitutes a *quasi*-punishment for not settling, it stands on a similar footing to a punitive damage award. While we realize that this interest is not actually encompassed in the Punitive Damage Act, the prejudgment interest on the post-judgment expenses in the case before us would be over twenty times the

### b. Tolling of Interest

██ Defendant also asserts that all prejudgment interest should have been totally tolled for a two-year period, February 1994 through February 1996, where the delay was caused solely by reason of plaintiff's failure to bring the case to trial. Actually, most of this delay was caused by plaintiff being required to obtain a new liability expert after his initial expert suffered incapacitating strokes. The judge found no misconduct or lack of cooperation and a reasonable basis for the various adjournments required by plaintiff. He therefore determined that there was no reason to foreclose interest for this period.

As to sums due for this period, defendant had use of the funds and could invest them; plaintiff lost this income. The prejudgment interest rule provides a sensible adjustment. The judge made a reasoned decision not to suspend prejudgment interest for this two-year period, and we find no fault with the judge's decision.

### c. Proof of Future Medical Expenses—Failure to Discount

██ Defendant next attacks plaintiff's proof of future medical expenses. Plaintiff's medical expert, Dr. Martin, testified concerning both the amount of plaintiff's annual medical costs, and also about how these costs would be projected into the future. He based these latter projections upon his consultation with plaintiff's economist, Dr. Richard Ruth, to compute the difference in the costs of medical treatment from 1989 when the witness examined plaintiff to the 1996 trial. He based his conversion factor on the increase in the medical services component of the consumer price

---

maximum limit on punitive damages, an issue stricken from this case. It seems anomalous that if defendant had wantonly designed the car to inflict this injury, the damages, if the Punitive Damage Act applied, would be limited to $350,000. But for trial delays, not all attributable to defendant, it would be punished for over $8,500,000. This argument, of course, could not have been considered by the Supreme Court in *Ruff,* as the case was decided some eight years prior to the enactment of the statute.

index. Applying that percentage charge to plaintiff's medical expenses increased the approximate figure of $220,000 per year from 1989 to $369,250 in 1996.[17] (In fact, the base figure of $220,000 was initially increased to $250,000 to account for various elements of medical treatment for which the witness had been given no particular figures).[18] He recognized that plaintiff's life expectancy because of his injuries would be less than the normal life expectancy for his age, and reasoned that plaintiff had a projected life expectancy of approximately thirty-five years.

Dr. Martin was asked to describe "the formula one would use in order to arrive at what his future cost would be." Over defendant's objection, he answered as follows:

> You take the figure of $369,250 and you multiply that by the 35 years of expected life—of life expectancy and you get the final figure.

At the next trial session, plaintiff's attorney returned Dr. Martin to this topic:

> Q: Doctor, could you just tell us one more time how we take that figure $369,250 and predict how much money is necessary to maintain [plaintiff] medically and with the equipment and with the care that you deem is proper for someone with his condition?
>
> A: Well, we multiply that figure by the projected . . . life expectancy at this time of about 35 years.

The jury awarded plaintiff $13,000,000 for his future medical expenses. We note that 35 years multiplied by $369,250 equals $12,923,750.

---

[17] Defendant also questioned Dr. Martin's ability to testify as an economist. He stated, however, that he based his cost projections on his conversation with Dr. Ruth, an economist who testified later in the case and provided a sufficient foundation for Dr. Martin's testimony. The judge, therefore, properly ruled that Dr. Martin's testimony on the consumer price index would be received subject to Dr. Ruth's anticipated expert opinion concerning the consumer price index.

[18] Defendant did not object to the various categories of future expenses that would be necessary in plaintiff's care and treatment. Special cars, chairs, house renovations, as well as medication and therapy all were included without objection.

*Tenore v. Nu Car Carriers, Inc.*, 67 *N.J.* 466, 341 *A.*2d 613 (1975), holds that expert economic evidence "purporting to show plaintiff's aggregate damages," there a wage loss claim, was improper, primarily because the projection before the jury of a "gross figure" or "total resulting damage figure" submitted by an expert "tends to exert an undue psychological impact leading to the danger of its uncritical acceptance by the jury in the place of its own function in evaluating the proofs." *Id.* at 482–83, 341 *A.*2d 613. The plaintiff's experts may, however, "provide the jury with their analyses of trends of future wage increases and discount interest rates generally," and the jurors can "use those trends and rates in arriving at their own independent single-figure appraisal of plaintiff's pecuniary loss." *Id.* at 483–84, 341 *A.*2d 613.

In *Genovese v. New Jersey Transit Rail Operations, Inc.*, 234 *N.J.Super.* 375, 560 *A.*2d 1272 (App.Div.), *certif. denied,* 118 *N.J.* 195, 570 *A.*2d 960 (1989), the trial judge himself elicited testimony from the plaintiff's expert economist "announcing 'bottom line' wage loss figures." *Id.* at 378, 560 *A.*2d 1272. On the next day of trial, the judge concluded that he had erred because such expert testimony "clearly violated the prohibition of such testimony announced in *Tenore,*" and he twice instructed the jury to "disregard the bottom line figures." *Ibid.* The jury found the defendant liable, and assessed damages of $413,000. *Id.* at 377, 560 *A.*2d 1272. Noting that the jury's damage verdict of $413,000 was "suspiciously near one of the witness's bottom line figures of $425,000," this court reversed the damage verdict and remanded for retrial on that issue. *Id.* at 379, 383, 560 *A.*2d 1272. Referring to the *Tenore* rule, in *Genovese* we concluded that the trial judge's curative instructions were insufficient to overcome the "strong psychological impact on the jury of the court-invited testimony of gross numbers." *Id.* at 379, 560 *A.*2d 1272.

In *Dunn v. Praiss,* 256 *N.J.Super.* 180, 606 *A.*2d 862 (App.Div.), *certif. denied,* 130 *N.J.* 20, 611 *A.*2d 657 (1992), the plaintiff's economic expert wrote his damage assumptions, calculations and conclusions on four charts which, over the defendants' objection, were permitted into evidence, and accompanied the jury into the

jury room as an exhibit (a separate error, not repeated here). *Id.* at 196–99, 606 *A.*2d 862. On the last chart was a summary that, among other things, said "28 × $36,350." *Id.* at 197, 606 *A.*2d 862. On the issue of economic loss, the jury awarded $1,017,800 to the plaintiff. *Id.* at 198, 606 *A.*2d 862. (The 28 years, multiplied by $36,350, equals $1,017,800). As in *Genovese,* in *Dunn* we reversed the damage verdict and remanded for a retrial on that issue. *Id.* at 202, 606 *A.*2d 862.

 We recognize that while *Tenore* "bars 'bottom line' evidence of future wage losses," *Tenore* "does not, however, bar an attorney's argument in summation which includes the bottom line income loss calculation which the expert witness is forbidden to make." *Lovenguth v. D'Angelo,* 258 *N.J.Super.* 6, 9–10, 609 *A.*2d 47 (App.Div.1992), *appeal dismissed,* 133 *N.J.* 417, 627 *A.*2d 1128 (1993). There, however, we were careful to state "that we deal here only with a future income loss summation argument that completes the arithmetic prohibited to the expert witness." *Id.* at 10, 609 *A.*2d 47. We see no reason not to apply the *Tenore* principles, as interpreted by the cases, to testimony concerning the cost of future medical and care expenses.

In its post-trial motion, defendant argued that "what Dr. Martin did violates the *Dunn* case." The judge disagreed, pointing out that the plaintiff's expert is "allowed to give the jury a yearly figure and to give the jury either a life expectancy figure or a work life expectancy figure," and concluding that he perceived no prejudice in this case, "as long as the expert does not give a bottom line figure." According to the judge, Dr. Martin did not do so:

> Yes, Dr. Martin, it might have been better had he not said do the math. But the point is that it's there in black and white and there was nothing improper about giving the jury those two figures. I can't—it's very difficult to conclude now that the jury placed too much emphasis on a bottom line figure. Indeed, he—they weren't given the bottom line figure. The true evil, I think, is for the doctor to have multiplied it all out and arrive at a figure of $12,923,000. The jury's seeing that then perhaps might have been swayed too much by the expert's math.

Plaintiff argues that Dr. Martin's testimony did not contravene *Tenore,* because he merely presented a "formula for calculating

future medical costs," but he "did not make the ultimate calculation of the future medical costs," in that he did not do the multiplication and present the jury with the resulting "bottom line number." While defendant acknowledges that "Martin did not actually put pen to paper to write out the number for the jury," defendant, relying on *Dunn*, argues that Dr. Martin's formula was the "equivalent of a 'projection of a gross figure before the jury submitted by an expert,' which *Tenore* holds is improper."

Dr. Martin did not calculate each year's loss, with inflation factors, and discounting, but only calculated the then-current cost of plaintiff's care and life expectancy. Had he stopped there, and left the use of these figures to the economist, there may not have been error. His problem, as will be explained, was his telling the jury to multiply the 1996 figure by plaintiff's life expectancy, in effect testifying to a total-offset recovery theory, discussed *infra*. Hence we find that plaintiff's proof of future medical expenses was admitted in error. This error was compounded by the omission of instructions on applying present value discounting.

Dr. Martin's testimony was not the sole basis for the calculation of future medical expenses and wage loss damages. Plaintiff's economist, Dr. Ruth, testified in detail concerning two ways to compute future damages: the total offset method and the standard method. The total offset method posits that the rate of inflation will cancel the fair return from the amount awarded when it is prudently invested, and therefore a jury may merely multiply the annual amount necessary to make the plaintiff whole by the relevant number of years. Where the issue is one of lost wages, the net wages after taxes would merely be multiplied by the number of remaining years of the plaintiff's working life; and the future medical expense or future pain and suffering would similarly be multiplied by the plaintiff's life expectancy. This was obviously the method testified to by Dr. Martin and was the first of the two methods proposed by Dr. Ruth.

The second method requires the discounting of the stream of income to its present value, using an appropriate discount rate.

In the case before us, taxes would not be a consideration since the amount of the lost wages would be discounted on an after-tax basis. *Caldwell v. Haynes*, 136 *N.J.* 422, 436–40, 643 *A.2d* 564 (1994). The medical expenses would be largely deductible on plaintiff's tax return,[19] unless there is a radical amendment of the Internal Revenue Code.

As this court noted in *Friedman v. C & S Car Serv.*, 211 *N.J.Super.* 657, 670–73, 512 *A.2d* 560 (App.Div.1986), *rev'd,* 108 *N.J.* 72, 527 *A.2d* 871 (1987), the total offset method does not reflect reality.[20] The critical determination is the selection of a reasonable discount rate for the standard method. As was noted in our opinion in *Friedman*, from the period of 1926 through 1985 the rate of return for common stocks, corporate bonds, and government bonds exceeded the rate of inflation by varying amounts. *Id.* at 671, 512 *A.2d* 560. What was true in the double-digit inflation of past years, is even more true at the current time when inflation apparently is in check and has for the past few years been held to approximate three percent or even less. Investments in quality common stocks have for the past few years exceeded twenty percent, and, while we assume that these rates cannot be duplicated year after year, a balanced portfolio of stocks, corporate and government bonds and certificates of deposit

---

[19] The fund would, if accurately awarded and used, generate income to which an appropriate amount of the principal would be added, so that the fund would be exhausted in the last year of plaintiff's life. The income, therefore would be less than the expenses, which would be deductible when they exceed a certain percentage of plaintiff's income.

[20] The Supreme Court's reversal was on the basis that a pain, suffering and disability judgment should not be discounted, as plaintiff's was not in this case. The Supreme Court distinguished the pain and suffering damages from the economic damages in *Tenore, supra*, where discounting was ordered. The Court required that such economic damages be discounted to present value because such calculation was "neither artificial nor unrealistic." 108 *N.J.* at 78, 527 *A.2d* 871. Despite the Supreme Court's reversal, our opinion in *Friedman* provides a good discussion of the necessity to discount awards for future economic expenses.

certainly would yield far in excess of the projected inflation rates, especially for a portfolio of the size of plaintiff's net award. Even if inflation rates should rise, prudent investment returns should keep well ahead of inflation.

These considerations were totally absent from Dr. Martin's testimony, and Dr. Ruth's charts described in the record (and shown to us at oral argument) listed only two columns, one for the total offset computation, and one for a one percent discount rate. Dr. Ruth did testify, however, that if the jury chose to use a different rate it could do so, but this testimony was not aided by any percentage figures by which the jury could adjust its total award. Dr. Ruth was not cross-examined.

Similarly, the trial judge in his charge did not aid the jury beyond the standard charge that it should take into consideration the factor of inflation and the discounting of its damages award for post-judgment medical expenses and future pecuniary losses to present value. The court did not fill in the gap left by the expert witnesses as to what percentages the jury could apply and how to apply them, even though these percentages are supplied as a table attached to our court rules. *See* Pressler, *Current N.J. Court Rules*, Appendix I. The appropriate line representing plaintiff's future life expectancy, as testified to by Dr. Martin without opposition, showing percentage rates in a reasonable range might have given the jury greater options. The brief comment that the jury could use a different rate, if it wished, was insufficient.[21]

We note that defendant offered no evidence on this subject nor even cross-examined Dr. Ruth to bring out the additional figures that could have made the process more understandable to the jury. Here, the array of witnesses called by defendant indicated that this case was prepared with immense resources and with a complete understanding of the issues to be determined. The trial

---

[21] While the judge also noted that the jury should take taxes into consideration, there was no indication that the future medical expenses would constitute a tax deduction which would largely offset the taxes on the income portion of the income and principal which was to be applied to defray the expenses.

judge is not expected to try the case for either a plaintiff or defendant. But the judge still has an obligation to make the jury function understandable. Dr. Ruth's testimony explained the application of a one percent discount, and he told the jury that it could also use a two percent, three percent, or four percent discount rate. Dr. Ruth, however, neglected to mention how the jury would perform this function.

While in no way excusing defendant's failure to present evidence on this point, it is apparent to us that the jury's verdict should have been reduced to present value using some reasonable discount rate. We therefore remand the matter to the Law Division on this point for a supplemental hearing. The judge may effect a remittitur after the parties present any necessary proofs concerning a fair market return on a balanced portfolio of prudent investments and a reasonable estimate of medical expense inflationary costs. We recognize this is far from an exact science, but a total disregard of these factors, which in effect applies the total offset method, flies in the face of present reality and demands our intervention to achieve substantial justice between these parties.[22] We trust that on remand the court can order payment of all sums not in dispute, if that has not been accomplished by this date.

## VI. Application of Settlement Proceeds

Plaintiff has cross-appealed from the judge's decision to deduct $799,000 from the award. The deduction represents the settlement of plaintiff's claim against the van driver and her employer. Plaintiff claims that the jury's determination that 100% of plaintiff's injuries were caused by the defective design of the Camaro

---

[22] We understand that our taking this action will affect the amount of the adjustment for prejudgment interest we have already discussed. We also suggest, but cannot order, that the parties consider structured payments that would provide for the actual medical bills, thus compensating for estimates or predictions of plaintiff's longevity, the costs of future services, medical advances, and the like. The authority to direct rather than merely suggest such a solution, with its attendant lower costs, can only come from a legislative or Supreme Court direction.

forecloses any liability that the settling defendants could have had in this case. Defendant argues that the settling former co-defendants' liability was not adjudicated in this case, and that they may have been liable for some percentage. GM reasons further that the former co-defendants' liability would have encompassed not only injuries related solely to the accident, but also injuries relating to plaintiff's second injuries assessed under his crashworthiness claim.

Again, we must view the twin issues of causation of the accident and causation of the injury. Given plaintiff's claim that the van was straddling the center line forcing plaintiff to swerve around it (and putting to one side the independent witness' description of plaintiff having been on the van's side of the road with the van totally within its own lane), it is conceivable that a jury could have allocated some small percentage of negligence assessed against the settling former defendants. We proceed with this assumption to determine whether the jury's determination exonerated the settling defendants.

*Huddell v. Levin, supra,* provides an answer, namely, that the settling defendants in our case would have been in the position of the defendant Levin in that case. The court stated that "Levin may be held liable for *all* injuries, but General Motors may only be held liable for 'enhanced injuries'." 537 *F.*2d at 738 (emphasis in original). Such injuries would be "for the entire consequences of ... [the] accident which the automobile manufacturer played no part in precipitating." *Id.* at 739. A similar statement can be found in *Waterson v. General Motors Corp., supra,* 111 *N.J.* at 271, 544 *A.*2d 357, "A party responsible for the accident is always also responsible for the injuries incurred as a result of the accident." The 100% adjudication by the jury in plaintiff's claim against GM tells us nothing concerning the respective liabilities of the van driver to plaintiff or the van driver to defendant for contribution. Theoretically, the van driver might have been liable for a percentage of all damages occasioned by the accident, unless a court held that the design defect was an independent intervening cause, relieving the van driver of her liability.

As we noted earlier, plaintiff's comparative negligence could have been assessed against the van driver's, but plaintiff's comparative fault as against GM would be limited to plaintiff unreasonably proceeding in the face of a known danger. *Suter v. San Angelo Foundry & Mach. Co., supra,* 81 *N.J.* at 158–60, 406 *A.*2d 140; *Cartel Capital Corp. v. Fireco of New Jersey, supra,* 81 *N.J.* at 562–63, 410 *A.*2d 674.[23] GM, however, may have been able to hold the van driver for contribution for some percentage of the total fault responsible for plaintiff's injury. Plaintiff settled with the van driver and her employer after the earlier trial ended in a mistrial because of a hung jury, and GM apparently was satisfied not to have made a cross-claim for contribution or to have applied to the court to assess any percentage responsibility to the settling parties.

If the settling former co-defendants had been found to have no liability, the principles announced in *Rogers v. Spady,* 147 *N.J.Super.* 274, 278, 371 *A.*2d 285 (App.Div.1977), and confirmed in *Young v. Latta,* 123 *N.J.* 584, 591, 589 *A.*2d 1020 (1991), would permit plaintiff without question to keep the $799,000 as a windfall,[24] in addition to the award in this case. *See also Johnson v.*

---

[23] The *Restatement (Third) of Torts: Products Liability* notes that New Jersey is in a small minority of states applying this quasi-assumption of risk rule that grew out of comment n to § 402A of the *Restatement (Second) of Torts.* This rule had been an answer to the old total bar of a plaintiff's contributory negligence. At some point the Court may wish to reassess this rule so firmly stated in *Suter, Cartel Capital* and their progeny. If this were done, the assessment in Part I of this opinion might yield a different result. The Reporters for the *Restatement (Third) of Torts: Products Liability* note that the courts of the country are "sharply split" on the issue of whether a plaintiff's negligent conduct leading to an accident should be the subject of comparative fault. They conclude that a "majority of the courts allow the introduction of plaintiff's conduct as comparative fault in a crashworthiness context." Reporters' Note, § 16, cmt. f. Our rules of limited comparative fault place us with the minority on this issue.

[24] In truth, such a settlement is only a windfall by hindsight. Plaintiffs and defendants settle for a variety of reasons, and are guided by enlightened self-interest as it is perceived at the time.

*American Homestead Mortg. Corp.*, 306 *N.J.Super.* 429, 436–37, 703 *A.*2d 984 (App.Div.1997). But, the windfall exists only where a jury determines that the settling party was 0% negligent. If a percentage of liability had been assessed against these former co-defendants, that percentage of the verdict would have been deemed satisfied. *Young v. Latta, supra,* 123 *N.J.* at 591, 589 *A.*2d 1020; *Rogers v. Spady, supra,* 147 *N.J.Super.* at 277, 371 *A.*2d 285. Lastly, a settlement may be, as here, accomplished with one who is neither exonerated nor assigned a percentage because the non-settling defendant never requested such a finding. Plaintiff claims that in such a case the non-settling defendant, GM, loses its right to claim a credit.

In *Young v. Latta, supra,* the Court assessed the consequences of the usual cross-claim for contribution and a delayed assertion of the claim without a formal cross-claim.

> Although early and diligent pursuit of a non-settling tortfeasor's claim for credit seems to have obvious advantages, there may be tactical reasons, not readily apparent to us, why the non-settler would delay asserting that claim. We emphasize that in this context trial courts should not countenance delay—that is, the court should not permit the non-settler to wait until the last minute before alerting the court and the plaintiff's lawyer that the settler's conduct will be at issue. Because tactics cannot be allowed to foil discovery, in the context of a claim for credit the court should enforce strictly the Rules setting forth the time prior to trial within which answer to interrogatories may be amended to set forth a settler's fault. *See Rule* 4:17–7.
>
> [123 *N.J.* at 597–98, 589 *A.*2d 1020].

Here, however, the assertion was not just delayed, it was nonexistent. GM never claimed that the jury should assess the van driver's responsibility for plaintiff's injuries; no credit was even suggested until GM requested the $799,000 offset. In such a case, we refer to *Mort v. Besser Co.*, 287 *N.J.Super.* 423, 671 *A.*2d 189 (App.Div.1996), *certif. denied,* 147 *N.J.* 577, 688 *A.*2d 1053 (1997). There, in a slightly different setting (where the settling defendant had no separate liability as a matter of law, *id.* at 433, 671 *A.*2d 189), Judge Keefe commented on the obligations of the non-settling defendant to protect the record.

> Clearly, a non-settling defendant has the right to have a settling defendant's liability apportioned by the jury. *Kiss v. Jacob,* 138 *N.J.* 278, 283–84, 650 *A.*2d 336

(1994); *Cartel Capital Corp. v. Fireco of N.J.*, 81 *N.J.* 548, 566–67, 410 *A.2d* 674 (1980); *Rogers v. Spady*, 147 *N.J.Super.* 274, 278, 371 *A.2d* 285 (App.Div.1977). However, that liability must be proven. The fact of settlement does not prove the settlor's liability. "[I]f no issue of fact is properly presented as to the liability of the settling defendant, the fact finder cannot be asked, under *N.J.S.A.* 2A:15–5.2 or otherwise, to assess any proportionate liability against the settler." *Young v. Latta*, 233 *N.J.Super.* 520, 526, 559 *A.2d* 465 (App.Div.1989), *aff'd*, 123 *N.J.* 584, 589 *A.2d* 1020 (1991).

[*Id.* at 431–32, 671 *A.2d* 189].

This duty on the part of the non-settling defendant to provide percentage of fault applicable to the settling party is also reflected in the proposed *Restatement (Third) of Torts: Apportionment of Liability,* § 27B (Council Draft No. 2, Nov. 13, 1997), which states:

> The plaintiff's recoverable damages are reduced by the comparative share of damages attributable to a settling tortfeasor who otherwise would have been liable to nonsettling defendants for contribution. The settling tortfeasor's comparative share of damages is the percentage of comparative responsibility assigned to the settling tortfeasor multiplied by the total damages of the plaintiff.

Comment f to this section requires the non-settling defendant to prove "that the settling tortfeasor's tortious conduct was a legal cause of plaintiff's injury ..., that the settlement was for the injuries for which the plaintiff is suing, and that defendant would otherwise have a valid contribution claim against the settling tortfeasor." *Id.* at cmt. f.[25] Thus, we have before us what appears to be the first case of a procedural bar to the assessment of the settling defendant's liability for the accident. We see no reason to treat the bar any differently from any other assertion of a defendant's factual or legal inability to assert the contribution claim.

The jury in our case made no determination of the van defendant's liability. It found only that as between plaintiff and

---

[25] The Reporters' Note at comment f of § 27B to *Restatement (Third) of Torts: Apportionment of Liability* cites as authority *Spaur v. Owens–Corning Fiberglas Corp.*, 510 *N.W.2d* 854, 863–64 (Iowa 1994). *Cf. Ball v. Johns–Manville Corp.*, 425 *Pa.Super.* 369, 625 *A.2d* 650, 661 (1993). In *Spaur*, there was no legal or factual basis for the non-settling defendant's claim. In *Ball*, the issue turned on factual bases for the claim against the settling defendants.

defendant, defendant was 100% responsible for plaintiff's injuries. This finding would have been the same whether on one hand the school van had completely blocked the road and plaintiff had been operating his vehicle within the legal limit, or on the other, if the van were standing still in its own lane with its flashers activated. Defendant, by failing to have the jury assess the van driver's percentage of fault, gave up its potential claim to contribution. Under the entire controversy doctrine it is now too late to assert the claim. Defendant is not entitled to any credit for the settlement even if it amounts to a windfall to plaintiff.

### VII. *Application of Pro Tanto Credits*

Defendant also claims that if a *pro tanto* credit were to be found proper, the credit should be against the verdict before prejudgment interest is assessed rather than after. Defendant properly notes that applying the credit to the judgment after the prejudgment interest is assessed in effect gives plaintiff the benefit of prejudgment interest on the credit, an amount that itself is subject to no such interest. We have vacated the credit, and therefore the issue is moot.

### VIII. *Conclusion*

We affirm the liability judgment in favor of plaintiff. We vacate the prejudgment interest awarded on post-judgment medical expenses and earnings. We remand that portion of the jury's verdict that awards post-judgment medical expenses and earnings. We direct the judge to enter a remittitur after further argument, with or without proofs, reflecting the present value of these awards as more extensively described in this opinion. We reverse the judge's determination to give defendant a *pro tanto* reduction of the judgment based on plaintiff's settlement with the former defendants, the van driver and bus company. This amount shall be restored to the judgment. Except as stated, we affirm the damage award.